**Richard McKENZIE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–89–109–CR.**

Court of Appeals of Texas,
Beaumont.

Aug. 30, 1989.

Mike DeGeurin, Houston, for appellant.
Gerald Goodwin, Lufkin, for the State.

## OPINION

BROOKSHIRE, Justice.

██ Appeal from district court order denying the Appellant's application for writ of habeas corpus and refusing the Appellant's request that bail be set. The Appellant argues that the district judge failed to act correctly in accordance with Article I, section 11 of the Texas Constitution.

The appeal, we decide, is properly before this intermediate appellate court. Appellant concedes that the trial court's refusing the Appellant's request for bail was a hearing or proceeding pursuant to *TEX. CONST. Art. I, sec. 11.* Article I, section 11 contains no proviso expressly granting a right of appeal to the Court of Criminal Appeals sitting at Austin. This specie of direct appeal, pursuant to Article I, section 11, lies within the jurisdiction of the court of appeals under the general jurisdiction provisions of Article V, sections 5 and 6 of the Texas Constitution. *Primrose v. State,* 725 S.W.2d 254 (Tex.Crim.App.1987); *Beck v. State,* 648 S.W.2d 7 (Tex.Crim.App.1983).

Appellant was charged by a grand jury indictment alleging that on or about November 11, 1988, appellant did then and there intentionally and knowingly cause the death of an individual, John Turner, by employing Charles Resino for remuneration and the promise of remuneration being payment of United States currency, to murder John Turner and that pursuant to that employment such murder was committed by Charles Resino by shooting John Turner with a deadly weapon, a firearm.

In brief, vernacular language, Richard McKenzie is alleged to have been the "go-between" who is alleged to have hired a "triggerman" for a woman friend of McKenzie. The woman allegedly had initiated the chain of events by contacting McKenzie. The triggerman was to kill the woman's boyfriend who had been abusing her, and who had forbade the woman even to ride in an automobile with the woman's husband. The alleged triggerman, Charles Resino, testified at the habeas corpus hearing for the State following a plea bargain. In capsule summary, Resino swore that the Appellant had told Resino in substance that this lady had a man who was whipping her, who didn't allow her to ride even in the same car with the lady's husband and that McKenzie (who telephoned Resino) wanted to know if there was any way that Resino knew of anyone who could take care of this problem by killing this man, John Turner, with a hit on the alleged abuser. Resino testified that he told McKenzie that he, Resino, probably did know someone and that he would get back in touch with McKenzie.

### Relevant Background Facts

Resino testified that he had been living in Houston for some time. The Appellant called him by long-distance telephone more

than once. The purpose of these long distance calls was to inquire about the probability of carrying out the wishes of an unidentified woman who wanted a certain man killed. Resino and the Appellant had known each other for many years and the contract price for the murder was originally $2,000 but over the course of dealing the sum was raised to $5,000. During some of the phone calls, the Appellant had asked Resino to come to Lufkin. Resino was asked on the witness stand what was the understanding of that which the Appellant wanted done. The answer was "wanted him killed." Resino definitely understood that the Appellant wanted the man killed. Resino was asked again what was meant by "taking care of this man" and his reply was "killing this man." Later Resino and a man identified as either John Manning or John Mims made two trips to Lufkin together. John Manning was sometimes referred to as John Mims in the record. The first trip to Lufkin was in November. During the first trip they went to McKenzie's. Resino testified that he and John went into the McKenzie home and McKenzie wanted to know when this matter could be taken care of and McKenzie was going to show Resino and John where "the guy" lived. McKenzie, John, and Resino traveled in John's rental car, but it was nighttime. They could not find the house of John Turner. The party of three returned to the McKenzie home and then McKenzie, according to Resino, asked when the matter could be taken care of and Resino said it would have to be in the daytime when they could see and could find the victim's house. Resino and John returned to Houston. Additional later phone calls were made. Resino was asked:

"Q  Okay.  And what was the purpose of those phone calls?

"A  Well, he [McKenzie] said it was getting crucial, like, the guy was getting ready to leave the state, go to a farm, a ranch or something or a farm somewhere.  And he needed to be taken care of before he left."

Resino was quizzed:

"Q  Okay.  Did McKenzie ever discuss with you what should be done with the body after the killing?

"A  He only said that something on the dash of the truck, put the body in the truck and take the truck off and just leave the truck and the man in the truck together.

"Q  That's how he said he wanted it done?

"A  That's the way both of them, him and the lady I talked to had said.

"Q  Okay.  Did you ever come back to Lufkin for the same purpose?

"A  Just that Friday that it happened on.

"Q  Okay, and who were you with at that time?

"A  John.  John Mims."

On the second trip to Lufkin Resino contacted McKenzie and called the lady involved to get the phone number of the victim. Resino called the victim who was killed and pretended that they were going to buy a car from the victim. Resino and John contacted the victim John Turner. They cranked the car up. They talked about the deal. They drank some beers together. At sometime after the beers were drunk, John Mims passed a pistol to Resino and Resino said that he, himself, freaked out and started shooting because the victim started hollering. He shot the pistol several times; he didn't know exactly how many times because the pistol snapped. The victim started running outside shouting "Oh, God" and the victim just was running outside screaming "help". Resino ran the victim to the ground and shot the victim in the head. Then Resino started taking the jewelry off, which consisted of a watch and a necklace from the victim, and he started going into the victim's pockets because there was supposed to have been a lot of money in the pockets. Then Resino heard some tires spinning and a motor running and Resino jumped up and saw his friend John leaving. John and Resino were supposed to have taken the dead man and put him in his truck and take the corpse and the truck to the woods. Resino and John had been instructed to obtain some important papers from the dashboard of this truck. McKenzie had

said that the lady had some important papers in the dash of the truck that needed to be recovered. Moreover, McKenzie had told Resino that the lady wanted to make the crime look like it was a robbery. Resino raced to John's rental car. Turner's corpse was left where he fell.

After the killing, Resino called McKenzie to let him know what had happened. Resino had instructions after the killing to give McKenzie a return call reporting the grisly murder. McKenzie and the contracting woman had some items that were in the dead man's house that they wanted to get out. Resino did not know what the two wanted to pick up, but he telephoned anyway to:

"... [L]et them know it didn't go down like it was supposed to; in other words, we didn't put the man in the truck and take him off, and my friend didn't do his part...."

Later, Resino met McKenzie at a Billups Filling Station in Nacogdoches and McKenzie delivered some money to Resino. McKenzie said he would be getting back in touch. The money was counted. It amounted to $1,800.

Resino testified that years before Richard McKenzie discussed another "hit" with Resino. The time was probably back in the seventies or eighties at which time McKenzie told Resino whom he wanted killed. This "hit" was not carried out although Resino swore that McKenzie paid him about a thousand dollars to carry out the contract. Either at the time or shortly before the $1,800 was delivered at the Billups Filling Station in Nacogdoches, McKenzie asked if the victim was dead. Resino told McKenzie "yes". Apparently there were two other payments made by McKenzie to Resino of $150 or $200.

Resino also testified that he had delivered 50 "Black Mollies" in Lufkin to McKenzie, the "Black Mollies" being identified as diet pills that stimulate a person. No salutary purpose would be accomplished by going into greater detail concerning the killing of John Turner.

There is no dispute in the record that the only motivation McKenzie had for

taking his active and determined role in the death of Turner was that the lady involved had done some favors for him. Article I, section 11 of the Texas Constitution, as well as Articles 1.07 and 16.15 of the Texas Code of Criminal Procedure provide that a defendant charged with a crime is entitled to bail except those charged with a capital offense "when the proof is evident." The phrase "proof is evident" means the evidence is clear and strong leading a well guarded and dispassionate judgment to the conclusion that a capital murder has been committed; that the accused is a guilty party; and that the accused will be convicted of capital murder with the jury returning findings which will require the imposition of a death sentence. *Ex parte Hammond*, 540 S.W.2d 328 (Tex.Crim.App. 1976); *Ex parte Wilson*, 527 S.W.2d 310 (Tex.Crim.App.1975). The burden of proof on the State includes the showing that the proof is evidence to the effect that the jury would return affirmative answers to the issues submitted on punishment under *TEX CODE CRIM.PROC.ANN. art. 37.071* (Vernon Supp.1989).

Thus, these issues under our record are:

1. Whether the conduct of McKenzie that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased John Turner would result;

2. Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Considering the record before us, and weighing the insistence on the part of McKenzie that Turner be done in even when Turner was preparing to leave the state (which would alleviate the problem that the lady had) as well as the fact that McKenzie motivated the two trips to Lufkin clearly demonstrates that the conduct of McKenzie was deliberate. In fact, it was determined and persistent. Also, there had to be much more than a reasonable expectation of the death of the deceased because McKenzie insisted and re-

quired that Resino notify him of the death of Turner before the money in whatever amount was delivered for the contract killer. We decide the proof is evident that a jury would find that the defendant would probably commit criminal acts of violence in the future that would constitute a continuing threat to society.

The circumstances and the details of this killing, itself, are severe enough and sufficiently heinous to sustain a jury's finding as to the probability of future acts of violence. The accused's background regarding narcotics also has probative value as to whether he and his actions constitute or will constitute a continuing threat to society, as well as unadjudicated extraneous offenses. These offenses have probative force as to future acts of violence. Here again, we perceive that the record reveals that the reason, given by McKenzie for his persistent and repeated actions and efforts in bringing about the death of John Turner, was simply the motive that the lady friend of his (identified as Ginger Forrest), whom he had known for several years, had done him some favors.

The evidence before us shows that the triggerman testified to horrendous facts very much against his interest. Resino admitted to capital murder in a clear, conclusive manner.

Resino knew the Appellant a long time and the Appellant's identity and participation in the "hit" are unquestionably established. The State argues that Resino still faces the prospect of a death penalty prosecution himself if he gives false testimony for himself or for another rather than giving truthful testimony. See *Ex parte Alexander*, 608 S.W.2d 928 (Tex. Crim.App.1980). The record does not reflect that Resino has lied against the Appellant.

In several salient aspects the defendant's own statement corroborates some of Resino's testimony. Appellant stated that Resino came to his house with another guy. After a beer Appellant directed Resino and his companion to Ford Chapel Road and Eastex Road. The Davisville Road was also pointed out. These roads were located near Turner's house. Appellant also admitted that Ginger Forrest contacted him on a holiday being Friday, November 11, 1988. She stated that there was a package in Appellant's mailbox. She asked the Appellant to deliver the same. The Appellant noticed that it was money with some paper wrapped around it held together by rubber bands. Appellant put this money in the console of his pick-up truck. When Resino called McKenzie to arrange a meeting at the old Billups filling station in Nacogdoches the Appellant drove to the old Billups station. Resino asked if the lady had given the Appellant a package. At that time, McKenzie remembered that he had a package. He then gave the whole package of money to Resino.

We do not perceive that the Appellant gives an innocent explanation for his unusual activities as set forth and detailed in his own statement. The Appellant even later admitted that in the statement that Ginger Forrest contacted him and stated "you know I had Charles Resino do a job for me on John". At that point the Appellant did, in his statement, recite that he did not want to hear any of that.

■ The State's brief acknowledges that the trial court's order states that the prosecution's burden in a hearing of this type does not extend to the Article 37.071, special issues. The State explains this away by stating that it had no opportunity to review the order before it was presented. The State argues that regardless of the district court's recitations in the order, the evidence in this record would amply support the affirmative findings of a jury to the special issues or questions required by Article 37.071 and that the district judge's decision to deny the habeas corpus writ and thereby to deny bail should be affirmed. We agree. The order denying habeas corpus was signed and entered on April 18, 1989. From the record, as we understand it, this order was filed at 4:45 o'clock p.m. on that date. Further, from the record, as we perceive it, the order may well have been originated and dictated in the offices of Foreman, DeGeurin and Nugent at sometime around 1:34 p.m. on August 18,

1989, the same day the judge signed the order. The document or order itself seems to reinforce the State's position. Nevertheless, the order recites that the trial court's opinion was that the burden of showing by evidence that was and is clear and strong leading to a well-guarded and dispassionate judgment applies only to whether a capital offense has been committed; but this burden of proof does not apply to the issues or questions of whether the jury would return findings which would mandate the imposition of a sentence of death is in error. We definitely conclude that part of the trial court's order was erroneous. Nevertheless, because of the strong, qualitative, valuational quality and probative force of the evidence before us, we deny habeas corpus and thus deny bail.

Important, significant and crucial it is to note the persistent, determined, calculated actions and forethought and the direct assisting in the execution of the plan on the part of McKenzie to murder John Turner. We decide these acts and statements are of a strong probative nature. This was not a crime of passion or a crime resulting from some afterthought while the Appellant was under the stress or strain of committing yet another horrendous offense. The Appellant was not at the scene when John Turner lost his life. Nothing in the record indicates, in fact, the record is not disputed to the effect that the Appellant was not under the influence of domination of anyone else when he decided to play the principal role in this contract "hit" murder scenario. See *O'Bryan v. State*, 591 S.W.2d 464 (Tex.Crim.App.1979), *cert den'd*, 446 U.S. 988, 100 S.Ct. 2975, 64 L.Ed.2d 846 (1980). There was, of course, no provocation by John Turner against this Appellant.

The decisions and rulings of the trial judge that the proof was and is evident is, of course, entitled to considerable weight and value on appeal. But, it is the duty of the reviewing court to reexamine the record and then determine if bail was correctly denied. We have performed this duty. We are persuaded that bail was properly denied.

An accused's background as well as use of narcotics or trafficking therein are of probative force as to whether that accused will constitute a continuing threat to society. *Ex parte Alexander, supra.* Unadjudicated extraneous offenses possess relevancy as to an accused's propensity to engage in future violent acts. *Garcia v. State*, 581 S.W.2d 168 (Tex.Crim.App.1979). Also reputation testimony of the accused for being a peaceful and law abiding citizen of his community is material and probative. *Brock v. State*, 556 S.W.2d 309 (Tex.Crim. App.1977).

The Court of Criminal Appeals has determined that a prior criminal record of final convictions is not essential to a jury's finding that a capital murder defendant would constitute an on-going threat to society. *Ex parte Alexander, supra,* at 930. Furthermore, no requirement exists mandating the State to present psychiatric or psychological evidence relative to future violent acts. *Ex parte Alexander, supra.* The writ of habeas corpus is denied. The ruling by the district judge that bail be denied is affirmed.

AFFIRMED.