Deeb v. State 















IN THE
TENTH COURT OF APPEALS
 

No. 10-91-237-CR

        MUNEER MOHAMMED DEEB,
                                                                                       Appellant
        v.

        THE STATE OF TEXAS,
                                                                                       Appellee
 

 From the 18th District Court
Johnson County, Texas
Trial Court # 24544
                                                                                                                
                                                                     
O P I N I O N
                                                                                                     

          Appellant was convicted of capital murder and sentenced to death. However, the Court
of Criminal Appeals reversed his conviction and remanded the cause for a new trial. See Deeb
v. State, 815 S.W.2d 692 (Tex. Crim. App. 1991). 
          Appellant filed an application for a writ of habeas corpus, requesting the trial court to set
bail pending the new trial. The court held a hearing on the application on December 5, 1991. At
the hearing, the State offered into evidence the indictment in the original cause, the charges on
guilt-innocence and punishment, and the Court of Criminal Appeals' opinion. The State also
asked the court to take judicial notice of the testimony in the original trial. Appellant's original
trial counsel testified that Appellant was a "good bond risk." The court, however, refused to set
bail. Appellant appeals, complaining that the court erred when it denied bail. We will affirm.
          A defendant is entitled to reasonable bail unless he is charged with a capital offense and
the "proof is evident." Tex. Const. art. I, § 11; Tex. Code Crim. Proc. Ann. arts. 1.07, 16.15
(Vernon 1980). "Proof evident" means that "the evidence is clear and strong leading a well
guarded and dispassionate judgment to the conclusion that a capital murder has been committed;
that the accused is a guilty party; and that the accused will be convicted of capital murder with the
jury returning findings which will require the imposition of the death sentence." McKenzie v.
State, 777 S.W.2d 746, 749 (Tex. App.—Beaumont 1989, pet. denied) (emphasis added); see also
Ex parte Hammond, 540 S.W.2d 328, 330 (Tex. Crim. App. 1976). When reviewing a denial of
bail, the trial court's conclusion that the proof is evident should be given "considerable weight." 
McKenzie, 777 S.W.2d at 751.
          The testimony of Daryl Beckham, who was in prison with one of Appellant's co-conspirators, was admitted at the original trial. The Court of Criminal Appeals ruled that this
testimony was inadmissible hearsay. The following portions of the Court of Criminal Appeals'
opinion demonstrate that, even without Beckham's testimony, the proof is evident.
On July 13, 1982, Jill Montgomery, Kenneth Franks, and Raylene Rice were
murdered. . . . 
 
The tortured bodies of Kenneth, Jill and Raylene were found on July 14th in
Speegleville Park, which is located near Koehne Park.
 
During the early evening hours of July 13th, David Wayne Spence, Gilbert
Melendez, and his brother, Andy Melendez, were driving around Koehne Park in Spence's
car when they came into contact with Kenneth, Jill and Raylene. Spence, the Melendez
brothers and the victims consumed beer and smoked marihuana. Spence persuaded the
others to get in his car so that they could purchase more beer at a nearby convenience
store. They left Raylene's car in Koehne Park.
 
Spence drove his car with Jill sitting next to him and Kenneth next to the passenger
door; Raylene and the Melendez brothers sat in the back seat of the car. After Spence had
harassed Jill and touched her breasts, she complained. Spence told her she couldn't tell
him what to do. . . .
 
Spence soon parked his car in Koehne Park. Everyone got out of the car. Spence
produced a knife and ordered Jill and Raylene to undress. Spence threatened the girls with
his knife. They obeyed his order. Spence raped Jill, and later, Raylene. Gilbert
Melendez raped Raylene. Anthony Melendez raped Jill.
 
Spence then returned to Jill. He cut and stabbed her with his knife. Anthony
Melendez then stabbed Jill with Spence's knife. Spence then bit Jill several times and
stabbed her again.
After murdering Jill, Spence returned to his car where he fatally stabbed Kenneth. 
Spence then turned to Raylene and fatally stabbed her.

Deeb, 815 S.W.2d at 699-700. This evidence shows that a capital murder was committed.
Jill Montgomery resembled Gayle Kelley. . . . 
Appellant took out a $20,000 insurance policy on the life of Gayle Kelley, with
himself as beneficiary; appellant told Maria Qasem, wife of his business partner, that if
anything happened to Gayle, he would get the money; in the presence of Karim Qasem,
appellant's business partner, appellant asked Spence if he knew somebody that would kill
Gayle for him; according to Qasem, Spence told appellant that he could get somebody and
appellant replied that he could get Spence some money for the job; according to several
witnesses, Gayle Kelley and Jill Montgomery resembled one another; after the murder took
place, appellant told Karim Qasem that if Gayle had been with Franks, "I would be rich
now"; after appellant made the second payment on the insurance policy, he said, "Wait and
see, she (Gayle) will die just like them"; appellant at one time told Gayle Kelley that
Franks got what he deserved; another time, appellant said to Gayle and a friend of hers,
"I did it. I killed them," though he immediately retracted the statement, saying that he was
only joking; in September, after Spence was incarcerated, Doris Tucker overheard
Spence's girlfriend demand Spence's money from appellant, and heard appellant order
Spence's girlfriend out of his store.
 
Gilbert Melendez, an accomplice of appellant, testified about his contacts with
appellant. Gilbert testified that he met appellant through Spence prior to the murder. That
Spence told appellant in Gilbert's presence, "I told him about you getting ripped off for
your drugs." [A]nd "The one trying to get your shit back." Gilbert said appellant nodded,
got nervous and changed the subject.
 
Gilbert Melendez testified that on the night of the murders, when he and Spence
first encountered the three victims, Spence called one of the girls by name and, "she came
back with a name that was similar . . ." Gilbert explained that "it was like what he
said—he had called her by the wrong name."
 
Gilbert also testified that he saw appellant two weeks after the murders, again in
the company of Spence. Spence told appellant that Melendez asked "If I had gotten any
money from you", and "I told him you were good for it, that you were going to get it." 
Gilbert also testified that appellant replied, "Yeah. I'll get it."
. . .
The evidence set out above [which excludes Beckham's testimony] serves as a
sufficient basis for the fact finder's determination that appellant hired David Wayne Spence
to kill Gayle Kelley for remuneration and a promise of remuneration, and that Spence
caused the death of Jill Montgomery while acting pursuant to that agreement.

Id. at 695, 701-02. Thus, the evidence shows that Appellant is a guilty party.
 
The facts in the instance case show the calculated nature of appellant's acts and
forethought with which he coldly planned, and then recruited someone to carry out, the
murders of Kenneth Franks and Gayle Kelley for the respective purposes of revenge and
remuneration. Prior to the murders, appellant insured the life of Gayle Kelley, and then
told Maria Qasem, "If anything happens to Gayle, I'll get the money." In the presence of
Karim Qasem, appellant and David Wayne Spence discussed the plot to get rid of Kelley. 
At that time, appellant promised Spence payment for the acts. After the murder occurred,
appellant calmly told his insurance agent, "The girl that was here, that you sold insurance
to, she was supposed to be with them. . . .
 
On the day after the murder, appellant told Willie Tompkins that his victims "got
what they deserved." Appellant told Tompkins about Kenneth Franks, "I don't like him. 
I hated him." To Tompkins, appellant appeared very serious.
 
Afterwards, in the presence of Maria Qasem, appellant was reading a newspaper
account of the murders and laughing. Appellant told Maria, "Gayle Kelley's boyfriend got
killed. . . . One of them should have been Gayle . . . because he would be rich now. . .
. he was glad to have them killed. . . . that they deserved it and he wished he would have
done it." Appellant also confronted Karim Qasem with these newspaper accounts. Karim
Qasem testified that appellant was laughing and excited, "Gayle's boyfriend got killed last
night. . . Gayle was supposed to be with him, you know. . . . I don't know why she
wasn't. . . .She wouldn't live for long. . . . Gayle would die just like them; she won't live
for long." To Karim Qasem, appellant appeared disappointed that Gayle Kelley was not
with the victims on the night of the murders.
 
Approximately a week after the murders, appellant was discussing them with Gayle
Kelley. Appellant told her that, "Franks got what he deserved. . . . Franks was not
allowed to die quickly, he was made to suffer, stabbed a lot of times around the heart." 
These facts, which proved appellant showed no remorse for his actions in bringing about
the deaths of the victims, also established that appellant may have a propensity to commit
future acts of violence.
. . .
Around the time, and after, the murders, appellant spoke to others about his desires
to see others killed or injured. Patti Pick testified appellant would come and visit her at
the store where she worked. One evening, a stocker was "bad-mouthing" her, whereupon
appellant stated, "I don't like him. And I'm going to do something to him. . . . I'll have
someone do it. I know people that do that sort of thing and if you have money you can
have anything." On another occasion, a friend of hers who was intoxicated was speaking
to her when appellant came to the store. Appellant told her, "Tell me if he upsets you, you
know, I'll do something to him. I'll—I'll go get in my car and wait for him to come out
and I'll run over him." Patti Pick could not recall if the incidents happened before or after
the murders, only that they occurred around that time.
 
Patti Pick also testified that she spoke to appellant in November, 1983,
approximately sixteen months after the murders. Appellant told her he was going home
to Jordan, but first he was coming to Waco to get even with Truman Simons, Kabena Reed
and Willie Tompkins. He told Pick that he should have killed Reed a long time ago, and
that Reed was the "reason everything bad happened to him . . . even the lake murders."
 
. . . In September 1982, after his arrest and release, appellant told Maria Qasem
that he was mad at Kelley and was "going to pay her back"; that he was mad at Kelley for
"putting him in jail"; and was going to "kick her ass." "He said he didn't really have to
do it, he had friends to do it." Karim Qasem also testified that appellant gave alcohol to
minors from the Methodist Children Home, and that he gave marihuana and pills to Gayle
Kelley while she was a resident of the home.
 
All of these factors, appellant's cool and calculated approach to the commission of
these crimes, his utter lack or remorse and wanton disregard for human life, and the
extraneous offenses, lead us to conclude that the fact-finder in the instant case had
sufficient evidence before it to decide beyond a reasonable doubt that appellant represented
a continuing threat to society.

Id. at 703-04. This evidence shows that the death penalty will be imposed.
          Accordingly, we hold that the proof is evident and that the court did not err when it denied
bail. Appellant's point is overruled and the judgment is affirmed.
 
                                                                                 BOB L. THOMAS
                                                                                 Chief Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed February 19, 1992
Do not publish