**Muneer Mohammed DEEB, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69551.**

Court of Criminal Appeals of Texas, En Banc.

June 26, 1991.

Rehearing Denied Sept. 25, 1991.

---

1. Now, the Texas Department of Criminal Justice, Institutional Division.

Richard McCall, Waco, David Anderson, Cleburne, John Segrest, Waco, Brian Wice, Houston, for appellant.

Vic Feazell, Dist. Atty., Waco, Dan Boulware, Dist. Atty., Cleburne, Andrew Shuvalov, Sp. Prosecutor, Austin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

WHITE, Judge.

Appellant was convicted of capital murder. See V.T.C.A., Penal Code § 19.-03(a)(3). This offense originated in McLennan County. Venue was changed to Johnson County pursuant to appellant's motion for a change of venue. After the jury made an affirmative finding on both of the special issues submitted under Art. 37.-071(b)(1) and (2), V.A.C.C.P., the trial court imposed the penalty of death.

On first submission, in response to appellant's tenth pro se point of error, this Court abated this appeal and remanded this cause to the trial court for a hearing to permit appellant to perfect the record. *Deeb v. State*, No. 69,551 (Tex.Cr.App., Nov. 2, 1988). The record now being complete, this Court will address appellant's remaining points of error. Appellant brought a total of fifty-seven points of error to this Court: appellant raised forty-nine points of error in his pro-se brief, first supplemental pro-se brief, and second supplemental pro-se brief; by appointment of the trial court, and over appellant's objections, amicus curiae counsel raised an additional eight points of error[1].

After reviewing the briefs and record in this cause, we find appellant is entitled to reversal and remand on amicus curiae's fourth point of error (In his pro se brief, appellant virtually copies this argument as his sixteenth point of error.): The trial court erred in allowing the testimony of Darryl Beckham relating to statements made by David Wayne Spence. In our opinion, we shall first deal with amicus curiae's fourth point of error. Second, we shall confront the other points of error which raise sufficiency of the evidence issues and due process issues.

### I.

In the amicus curiae's fourth point of error, it is alleged "that the trial court erred in allowing the testimony of Darryl Beckham relating to statements made by David Wayne Spence." Appellant makes the same allegation in his sixteenth pro se point of error.

---

1. This was not a situation involving hybrid representation by an appellant filing a pro-se brief in addition to the briefs filed by counsel appointed by a trial court to represent him on appeal. See *Scarbrough v. State*, 777 S.W.2d 83, 92 (Tex.Cr.App.1989). In contrast, in the instant case, the trial court initially granted appellant's request to represent himself on appeal, without any assistance from appellate counsel. Later, the trial court decided to appoint two attorneys to file appellate briefs as amicus curiae, independent of appellant's efforts on his own behalf. As such, this case does not in any way modify the rule set out in *Scarbrough*, whereby no defendant has an "absolute right to hybrid representation."

The state's theory of prosecution against appellant was that appellant planned the murder of Gayle Kelley for remuneration, that he conspired with David Wayne Spence to carry out that murder, and that acting pursuant to that agreement, Spence killed Jill Montgomery.[2]

The state proved several facts at trial. Jill Montgomery was murdered on July 13, 1982. Jill Montgomery resembled Gayle Kelley. David Wayne Spence, assisted by Gilbert and Anthony Melendez, killed Jill Montgomery, Kenneth Franks and Raylene Rice. On June 22, 1982, appellant took out an accidental death policy on Gayle Kelley that would have paid appellant, as her beneficiary, $20,000 in the event of her death. Appellant's finances at the time of the murder of Jill Montgomery were not good.

The state sought to prove that a conspiracy existed between appellant and Spence. The state offered evidence to show that appellant hired Spence to kill Kelley, offering Spence $5,000 from the insurance proceeds if he succeeded. Later, on July 19, 1982, appellant made a second payment on Gayle Kelley's insurance policy. Appellant was initially arrested on September 13, 1982. Spence was also arrested in September of 1982. Appellant was released from custody on September 18, 1982. Spence remained in custody. The insurance policy lapsed for non-payment of premiums on September 20, 1982. Appellant was arrested a second time on the instant offense on November 14, 1983 after he had been indicted for the murder of Jill Montgomery.

After appellant testified at trial, the state called Darryl Beckham to testify in rebuttal concerning conversations he had with David Wayne Spence regarding the conspiracy between appellant and Spence. Appellant objected that this testimony was inadmissible as hearsay. The state responded that Spence's statements were made in furtherance of the conspiracy and that the object of the conspiracy had not yet been accomplished. Appellant responded that any conspiracy between appellant and Spence had been terminated by the time Spence spoke with Beckham. The trial court overruled appellant's hearsay objection and admitted the evidence. Appellant repeatedly renewed his hearsay objection throughout Beckham's testimony until the trial court granted him a running objection.

From December, 1982 through January and February of 1983, Beckham was incarcerated with Spence in the McLennan County Jail. He and Spence were cellmates. Spence spoke extensively with Beckham about the murder of Jill Montgomery. According to Beckham, Spence stated:

"He said the reason that he did it was because a man named Lucky Muneer who owned the Rainbow had told him that ..." "Kenneth Franks and Gail Kelley had been doing something considered wrong in his country. They had been more or less two-timing Lucky." "... that he had to do something about it because in his country it was considered a dishonor to a man if someone else was doing that to his lady, and that he had wanted him to do something about it; that it had to be done, and that he wanted him to kill Gail Kelley and Kenneth Franks, and ..." "He told him that he wanted him to find someone to help him do it, and that he wanted to kill the people in a separate place in Speegleville Park and take them to Speegleville Park because him and David never went there at all and no one would suspect the bodies had been dumped there." ... "He said whoever he got to help him, for him to say that David Wayne Spence had sold the kids some drugs, that they had crossed him in a drug deal and that was why he wanted them killed; that way Lucky would not be involved in it in any way and no one would know about it." ... "He told me that Muneer told him that he would give him enough money to take care of him and the guy he got to help him." ... "He said that it was

2. In *Spence v. State,* 795 S.W.2d 743 (Tex.Cr. App.1990), cert. denied — U.S. —, 111 S.Ct. 1339, 113 L.Ed.2d 271 (1991), this Court affirmed the conviction of David Wayne Spence for the capital murder of Jill Montgomery.

according to how good he carried the job out, that he was going to open up a game room and he was going to let David Wayne Spence manage it, to start with, and that ... it was going to be in Waco." ... "He said he was supposed to paying for him a lawyer at that time." ... "He always talked about Lucky like he was a god or something, like he had money, and a celebrity, and like if he knew Lucky Muneer, then he wouldn't have to worry about anything else in his life."

Spence refused to testify at appellant's trial. Through his attorney, Spence communicated to the parties and the trial court that if he was called to the stand, he would assert his Fifth Amendment right to remain silent.

In appellant's briefs before this Court, he argues that Beckham's testimony was inadmissible because, at the time Spence spoke to Beckham, the conspiracy had been terminated by failure and because a partnership in crime between appellant and Spence could no longer exist under the circumstances. Appellant argues secondly, the testimony was inadmissible because the statements were not made in the furtherance of the conspiracy. In its briefs, the state responds that the conspiracy was still in effect and ongoing at the time Spence made the statements to Beckham.

The trial court admitted the above testimony under the coconspirator's exception to the hearsay rule. "Where there is sufficient independent evidence to establish a conspiracy, hearsay acts and statements of a conspirator which are made during the course of and in furtherance of the conspiracy are admissible against another conspirator." *Denney v. State*, 558 S.W.2d 467, at 469 (Tex.Cr.App.1977); *Bates v. State*, 587 S.W.2d 121, at 132 (Tex.Cr.App.1979).[3]

This construction, that the statement must be made in the course of and in furtherance of the conspiracy, was sup-

ported by early case law from this jurisdiction. *Knight v. State*, 7 Tex.App. 206, at 209 (1879); *Cortez v. State*, 24 Tex.App. 511, 6 S.W. 546, at 547 (1887); *Dungan v. State*, 39 Tex.Cr.R. 115, 45 S.W. 19 (1898); *Elliott v. State*, 111 Tex.Cr.R. 534, 15 S.W.2d 648 (1929); *Morphey v. State*, 119 Tex.Cr.R. 77, 45 S.W.2d 1099 (1932); and 1 Branch's Penal Code Annotated § 694, at p. 353 (1st ed. 1916). This construction is also supported by recent case law. *Rodriguez v. State*, 552 S.W.2d 451, at 454 (Tex.Cr. App.1977); *Denney v. State*, 558 S.W.2d, at 469; *Bates v. State*, 587 S.W.2d, at 132; and *Ward v. State*, 657 S.W.2d 133, at 137 (Tex.Cr.App.1983).

■ First, there is the issue of whether Spence's statements to Beckham were made during the course of the conspiracy. The essence of the conspiracy was for Spence to kill Kelley so that appellant could collect on the insurance policy and pay Spence from that policy payoff, and for Spence to kill Franks to satisfy appellant's desire for revenge. At the time Spence made his statements to Beckham, Franks was dead, appellant's insurance policy on Kelley had terminated, and Spence was incarcerated pending transfer to the Texas Department of Corrections on an unrelated felony conviction. There was no possibility of an insurance scam payoff or even of Spence being free to commit the murder of Kelley. The fact that Kelley was still alive and Spence had not yet been paid are not dispositive. We conclude that the conspiracy had been terminated before Spence made his statements to Beckham in jail.

■ Coconspirator's statements made after the termination of the conspiracy are inadmissible. In *Ward v. State*, 657 S.W.2d 133 (Tex.Cr.App.1983), this Court held that the defendant's wife's statements to a third party a few hours after the commission of the murder were not made

---

**3.** The instant cause was tried prior to September 1, 1986, when the Texas Rules of Criminal Evidence went into effect. At that time, the rule for the admission of a coconspirator's statement as an exception to the hearsay rule was codified as non-hearsay under Tex.R.Crim.Evid. Rule 801(e)(2)(E):

A statement is not hearsay if ... The statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

during the course of the conspiracy. This followed the "general rule that an act or statement of one coconspirator after the completion of the conspiracy is inadmissible against the accused. *Delgado v. State*, 544 S.W.2d 929, 931 (Tex.Cr.App.1977)." This Court concluded that the wife's statements were not admissible under the coconspirator exception to the hearsay rule. *Ward v. State*, 657 S.W.2d at 137. This Court reached a similar conclusion on rehearing in *White v. State*, 451 S.W.2d 497, at 502–503 (Tex.Cr.App.1970).

The state argues that a conspiracy cannot be terminated until the object of the conspiracy is completed: in this case, the murder of Kelley and the payoff to Spence. The state cites *Helms v. State*, 493 S.W.2d 227, 230 (Tex.Cr.App.1973); and *Brown v. State*, 576 S.W.2d 36, 41 (Tex.Cr.App.1979). The implication of this argument is that a conspiracy cannot be terminated by failure and can never be frustrated by insurmountable circumstances, as it was in the instant case. Utilizing the state's theory, the conspiracy between appellant and Spence could be said to still be ongoing, even though the insurance policy has lapsed and both men are incarcerated on death row. We disagree. This conspiracy was also terminated by failure and by frustration of the object of the conspiracy. This holding is not without support.

In *Krulewich v. United States*, 336 U.S. 440, 69 S.Ct. 716, at 718, 93 L.Ed. 790 (1949), the Court ruled that a conspiracy can be terminated by success or failure. In *Krulewich*, the Court held that the coconspirator's statement was made after the objectives of the conspiracy had either failed or been achieved. In *Anderson v. United States*, 417 U.S. 211, 94 S.Ct. 2253, at 2259, 41 L.Ed.2d 20 (1974), the Court, relying on *Krulewich*, held, "The hearsay-conspiracy exception applies only to declarations made while the conspiracy charged was still in progress." We conclude that Beckham's testimony does not fit the coconspirator's exception to the hearsay rule because the conspiracy was terminated pri-

or to Spence's jailhouse conversations with Beckham.

■ Second, appellant argues that Spence's statements to Beckham were not made in furtherance of the conspiracy. We agree. Spence's statements to Beckham did not advance the cause of the conspiracy or serve in any way to facilitate the conspiracy. In *Helms v. State*, 493 S.W.2d, at 230, the coconspirator's statement was made to facilitate the disposal of the murder weapon. In *Rodriguez v. State*, 552 S.W.2d, at 454, the coconspirator's statements were made to further the negotiations for the purchase of the illegal drugs. In *Denney v. State*, 558 S.W.2d, at 469, the coconspirator's statements were made for the purpose of disposing of the fruits of the crime and evidence that the crime had been committed. In contrast to these examples, in *Ward v. State*, 657 S.W.2d, at 136–137, the coconspirator's statements were made in response to questioning after the murder had been completed and the defendant was in custody. Spence's statements in the instant case are like the coconspirator's statements in *Ward*, and in contrast to those in *Helms*, *Rodriguez* and *Denney*. Spence's statements to Beckham were not made in furtherance of the conspiracy.

The requirement that the coconspirator's statements be in furtherance of the conspiracy both justifies and explains its status as an exception to the hearsay rule. In Ray, Law of Evidence, 1A, § 1171, at 332–333 (1980), the author explained,

It is an orthodox rule of the criminal law that each conspirator is responsible for the acts of his coconspirators done in pursuance of the conspiracy and during its existence. To that extent each conspirator is the agent of all others. This applies to verbal as well as non-verbal acts, and to assertive as well as non-assertive conduct. Hence the rule that when a conspiracy had been proved the acts and declarations of each conspirator during the pendency of the conspiracy and in furtherance of the common design are receivable against his coconspirators as admissions.

In *Anderson v. United States*, 94 S.Ct., n. 6, at 2259, the Supreme Court explained the basis for the exception:

> The rationale for both the hearsay-conspiracy exception and its limitations is the notion that conspirators are partners in crime.... As such, the law deems them agents of one another. And just as the declarations of an agent bind the principal only when the agent acts within the scope of his authority, so the declaration of a conspirator must be made in furtherance of the conspiracy charged in order to be admissible against his partner.

Spence's statements to Beckham also fail to qualify as an exception to the hearsay rule because they did not serve to further the conspiracy to murder Gayle Kelley for remuneration.[4] The trial court erred when it admitted Beckham's testimony over appellant's hearsay objection.

█ It is necessary that this error be examined under Rule 81(b)(2) of the Texas Rules of Appellate Procedure, which states:

> *Criminal Cases.* If the appellate record in a criminal case reveals error in the proceedings below, the appellate court shall reverse the judgment under review, unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the punishment.

In order to determine beyond a reasonable doubt that Beckham's testimony made no contribution to appellant's conviction, we need to examine the other evidence admitted at trial which showed that a conspiracy existed to kill Gayle Kelley and Kenneth Franks and that appellant was responsible for that conspiracy. This will not be an examination solely to determine if there is convincing evidence apart from

Beckham's testimony to prove that appellant is guilty of capital murder.

Appellant told Maria Qasem, wife of his business partner, that if anything happened to Gayle, he would get the money. In the presence of Karim Qasem, appellant's business partner, appellant asked Spence if he knew somebody that would kill Gayle for him. According to Qasem, Spence told appellant that he could get somebody. Appellant told Spence that he could get Spence some money for the job. After the murder took place, appellant told Karim Qasem that if Gayle had been with Franks, "I would be rich now." After appellant made the second payment on the insurance policy, he said, "Wait and see, she (Gayle) will die just like them." Appellant at one time told Gayle Kelley that Franks got what he deserved. Another time, appellant said to Gayle and a friend of hers, "I did it. I killed them," though he immediately retracted the statement, saying that he was only joking. Gilbert Melendez, an accomplice to Spence and appellant, testified that prior to the murders, and in his presence, Spence said to appellant, "I told him about you getting ripped off ...", and that appellant nodded, appeared nervous, and changed the subject. In September, after Spence was incarcerated, Doris Tucker overheard Spence's girlfriend demand Spence's money from appellant, and heard appellant order Spence's girlfriend out of his store. Even though this is enough evidence to conclude beyond a reasonable doubt that appellant took part in the conspiracy with David Wayne Spence, it is not, separately or taken as a whole, as conclusively or unequivocally damning as the testimony of Beckham.

Beckham's testimony reflected the post-arrest statements of David Wayne Spence,

---

4. In *Williams v. State*, 790 S.W.2d 643 (Tex.Cr. App.1990), this Court discussed this Court's decision in *May v. State*, 618 S.W.2d 333, at 346 (Tex.Cr.App.), *vacated on other grounds*, 454 U.S. 959, 102 S.Ct. 497, 70 L.Ed.2d 374 (1981), and its holding that a coconspirator's statement need only be related to the conspiracy. In *Williams*, this Court questioned whether there was support for the holding of this Court in *May*. Even though we stated that the decision in *May* left the law on the coconspirator exception to the hearsay rule "arguably unsettled" when Rule 801(e)(2)(E) was adopted, *Williams, supra*, at 645, this Court now concludes that *May* stands virtually alone against the great weight of case law on the coconspirator's exception to the hearsay rule. It also belies the intent and purpose behind the exception. See *Ray, Law of Evidence, la, supra*, and *Anderson v. United States, supra*. We hold that *May* is an anomaly in our case law and is not controlling in the instant case.

the man responsible for the carrying out of the murder plot. This testimony established from Spence's mouth that appellant was instrumental in securing through his insurance policy the means of remunerating Spence for the murder. Beckham's testimony also established that appellant would share insurance proceeds with Spence, that appellant took part in planning where the murders would take place and where the bodies would be disposed of to protect himself and Spence from detection, and that appellant had the primal motivation in wanting to see Kenneth Franks and Gayle Kelley murdered. Beckham's testimony intrinsically associated appellant with the death of Jill Montgomery. Tactically, Beckham's testimony was used in rebuttal, after appellant's own testimony, and distinct from the rest of the state's case in chief. In both the state's opening and closing final arguments at the guilt-innocence phase of appellant's trial, Beckham's testimony was emphasized as conclusively establishing appellant's guilt.

Under these circumstances, we cannot conclude beyond a reasonable doubt that the admission of Beckham's testimony did not contribute to the conviction or punishment. Tex.R.App.Proc.Rule 81(b)(2). The state has made no attempt in its briefs before this Court to establish otherwise. Amicus Curiae's fourth point of error and appellant's sixteenth pro se point of error are sustained.

In his seventeenth pro se point of error, appellant argues the trial court erred in its instructions to the jury regarding the statements of a co-conspirator made outside the presence of appellant. Appellant did not object to this instruction at trial. Since appellant is getting relief based upon the erroneous admission of Beckham's hearsay testimony, the issue of whether the trial court's instruction was egregiously harmful is moot. Appellant's seventeenth pro se point of error is overruled.

In Amicus Curiae's sixth point of error, they argue there was insufficient evidence to support a conviction under either theory alleged in the indictment. In appellant's third pro se point of error, he argues the evidence was insufficient to support the conviction as charged in the indictment. In appellant's fourth pro se point of error, he argues the evidence was insufficient to corroborate the accomplice testimony. For the purpose of his argument in his brief, appellant combined his third and fourth points of error. We will deal with all three of these points together. A brief summary of the facts of the instant offense is necessary.

On July 13, 1982, Jill Montgomery, Kenneth Franks, and Raylene Rice were murdered. All of the victims were teenagers, and all had previously attended the Methodist Home in Waco at the same time. When the instant offense was committed, Kenneth was then attending summer school in Waco. Jill and Raylene planned to attend public school in Waxahachie that fall.

During the morning of July 13, 1982, Jill and her friend, Raylene, each of whom then lived with their parents, drove to Waco in Raylene's car so that Jill could pick up her paycheck at the Fort Fisher Ranger Museum. After Jill had apparently cashed her paycheck, she telephoned Kenneth to see if they could get together. Jill and Raylene agreed to meet Kenneth at his home where he lived with his natural father. Jill and Raylene then went to Kenneth's house. Jill, Kenneth and Raylene soon left Kenneth's residence in Raylene's car, with their expressed destination being Koehne Park, which is located on Lake Waco. They only planned to stay for a couple of hours. They arrived at approximately 8:00 p.m., just before dark.

When Kenneth failed to return home as expected, his father began to search for him and the girls. Kenneth's father eventually found Raylene's car in Koehne Park. After he could not find Kenneth and the girls, and suspecting foul play, he filed a missing person's report with the Waco Police Department. The tortured bodies of Kenneth, Jill and Raylene were found on July 14th in Speegleville Park, which is located near Koehne Park.

During the early evening hours of July 13th, David Wayne Spence, Gilbert Melen-

dez, and his brother, Anthony Melendez, were driving around Koehne Park in Spence's car when they came into contact with Kenneth, Jill and Raylene. Spence, the Melendez brothers and the victims consumed beer and smoked marihuana. Spence persuaded the others to get in his car so that they could purchase more beer at a nearby convenience store. They left Raylene's car in Koehne Park.

Spence drove his car with Jill sitting next to him and Kenneth next to the passenger door; Raylene and the Melendez brothers sat in the back seat of the car. After Spence had harassed Jill and touched her breasts, she complained. Spence told her she couldn't tell him what to do. Spence then told Kenneth and Jill that he was going to get even with them because they had "ripped some dope" off of appellant. Kenneth denied he had done anything like that to appellant.

Spence soon parked his car in Koehne Park. Everyone got out of the car. Spence produced a knife and ordered Jill and Raylene to undress. Spence threatened the girls with his knife. They obeyed his order. Spence raped Jill, and later, Raylene. Gilbert Melendez raped Raylene. Anthony Melendez raped Jill.

Spence then returned to Jill. He cut and stabbed her with his knife. Anthony Melendez then stabbed Jill with Spence's knife. Spence then bit Jill several times and stabbed her again.

After murdering Jill, Spence returned to his car where he fatally stabbed Kenneth. Spence then turned to Raylene and fatally stabbed her.

Jill's body was found to have several bite marks on it, as well as multiple stab wounds to her left breast. Her body was also covered with a mass of bruises and severe cutting wounds. Kenneth sustained at least twenty stab wounds to his body, of which ten were to the heart area of his chest. Raylene also suffered multiple stab wounds. After the murders, Spence and the Melendez brothers moved the bodies to Speegleville Park.

Amicus Curiae concedes there is sufficient evidence to prove that Spence, Gilbert Melendez and Anthony Melendez committed the murder of Jill Montgomery. Amicus Curiae, and appellant pro se, dispute whether there is enough evidence to prove the conspiracy alleged in the first paragraph of the indictment: that appellant intentionally caused the death of Jill Montgomery by hiring David Wayne Spence to kill Gayle Kelley for remuneration and the promise of remuneration, and that Spence acted pursuant to that agreement, thereby causing the death of Jill Montgomery. Because we find there is sufficient evidence to support appellant's conviction under this theory, there is no need to address the question of sufficiency of the evidence to support a conviction under the theory alleged in the second paragraph of the indictment. As for appellant's fourth pro se point, that there was insufficient evidence to corroborate the accomplice testimony, we also find there is sufficient independent evidence tending to connect appellant to the commission of the instant offense so that Gilbert Melendez' testimony was corroborated. *Leal v. State,* 782 S.W.2d 844, at 851 (Tex.Cr.App.1989); and cases cited therein.

In determining the sufficiency of the evidence to determine whether the State has proved the elements of an offense:

"we must look at all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed the element beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in question beyond a reasonable doubt; rather, we are to ask ourselves whether the trier of fact, acting rationally, could have found the evidence sufficient to establish the element beyond a reasonable doubt. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Cr.App.1988). ... we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reason-

able doubt. *Jackson*, 443 U.S. at 318, 99 S.Ct. at 2788, 61 L.Ed.2d at 573. See also *Butler v. State*, 769 S.W.2d 234 (Tex.Cr.App.1989). *Blankenship v. State*, 780 S.W.2d 198, 206–207 (Tex.Cr.App.1988). We will review the evidence against appellant according to this standard.

■ We will include all the evidence admitted at trial in this review, including the testimony of Darryl Beckham. We have found that Beckham's testimony was erroneously admitted over appellant's hearsay objection. Admission of Beckham's testimony was trial court error. In determining the sufficiency of the evidence, the reviewing court must consider all of the evidence, whether properly or improperly admitted. *Lockhart v. Nelson*, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); *Dunn v. State*, 721 S.W.2d 325, 327 (Tex.Cr.App. 1986); *Beltran v. State*, 728 S.W.2d 382, 389 (Tex.Cr.App.1987). Thus, the improperly admitted testimony of Darryl Beckham must be reviewed in determining the sufficiency of the evidence.

Amicus Curiae concedes that if Beckham's testimony is included in a sufficiency review the evidence of appellant's guilt is sufficient as a matter of law. Appellant in his pro se brief does not make this concession. At trial, the state proved the following: Appellant took out a $20,000 insurance policy on the life of Gayle Kelley, with himself as beneficiary; appellant told Maria Qasem, wife of his business partner, that if anything happened to Gayle, he would get the money; in the presence of Karim Qasem, appellant's business partner, appellant asked Spence if he knew somebody that would kill Gayle for him; according to Qasem, Spence told appellant that he could get somebody and appellant replied that he could get Spence some money for the job; according to several witnesses, Gayle Kelley and Jill Montgomery resembled one another; after the murder took place, appellant told Karim Qasem that if Gayle had been with Franks, "I would be rich now"; after appellant made the second payment on the insurance policy, he said, "Wait and see, she (Gayle) will die just like

them"; appellant at one time told Gayle Kelley that Franks got what he deserved; another time, appellant said to Gayle and a friend of hers, "I did it. I killed them," though he immediately retracted the statement, saying that he was only joking; in September, after Spence was incarcerated, Doris Tucker overheard Spence's girlfriend demand Spence's money from appellant, and heard appellant order Spence's girlfriend out of his store.

Gilbert Melendez, an accomplice of appellant, testified about his contacts with appellant. Gilbert testified that he met appellant through Spence prior to the murder. That Spence told appellant in Gilbert's presence, "I told him about you getting ripped off for your drugs.", and "The one trying to get your shit back." Gilbert said appellant nodded, got nervous and changed the subject.

Gilbert Melendez testified that on the night of the murders, when he and Spence first encountered the three victims, Spence called one of the girls by name and, "she came back with a name that was similar ..." Gilbert explained that "it was like what he said—he had called her by the wrong name."

Gilbert also testified that he saw appellant two weeks after the murders, again in the company of Spence. Spence told appellant that Melendez asked "If I had gotten any money from you", and "I told him you were good for it, that you were going to get it." Gilbert testified that appellant replied, "Yeah. I'll get it."

Darryl Beckham also testified at trial concerning his conversations with Spence in January and February of 1983 while they were both incarcerated in the McLennan County Jail awaiting transfer to the Texas Department of Corrections:

"He said the reason that he did it was because a man named Lucky Muneer who owned the Rainbow had told him that ..." "Kenneth Franks and Gail Kelley had been doing something considered wrong in his country. They had been more or less two-timing Lucky." "... that he had to do something about it because in his country it was considered

a dishonor to a man if someone else was doing that to his lady, and that he had wanted him to do something about it; that it had to be done, and that he wanted him to kill Gail Kelley and Kenneth Franks, and ..." "He told him that he wanted him to find someone to help him do it, and that he wanted to kill the people in a separate place in Speegleville Park and take them to Speegleville Park because him and David never went there at all and no one would suspect the bodies had been dumped there." ... "He said whoever he got to help him, for him to say that David Wayne Spence had sold the kids some drugs, that they had crossed him in a drug deal and that was why he wanted them killed; that way Lucky would not be involved in it in any way and no one would know about it." ... "He told me that Muneer told him that he would give him enough money to take care of him and the guy he got to help him." ... "He said that it was according to how good he carried the job out, that he was going to open up a game room and he was going to let David Wayne Spence manage it, to start with, and that ... it was going to be in Waco." ... "He said he was supposed to paying for him a lawyer at that time." ... "He always talked about Lucky like he was a god or something, like he had money, and a celebrity, and like if he knew Lucky Muneer, then he wouldn't have to worry about anything else in his life."

■ The evidence set out above serves as a sufficient basis for the fact finder's determination that the appellant hired David Wayne Spence to kill Gayle Kelley for remuneration and the promise of remuneration, and that Spence caused the death of Jill Montgomery while acting pursuant to that agreement. E.g., *Deason v. State*, 786 S.W.2d 711 at 716–717 (Tex.Cr.App. 1990). Even if Beckham's testimony was excluded, there would be sufficient evidence to justify this conclusion. Amicus Curiae's sixth point of error and appellant's third point of error are overruled.

■ After eliminating from consideration the testimony of Gilbert Melendez, and examining the remaining evidence, we find that it independently tends to connect appellant to the commission of the murder of Jill Montgomery. *Gardner v. State*, 730 S.W.2d 675 (Tex.Cr.App.1987); *Jackson v. State*, 745 S.W.2d 4 (Tex.Cr.App.1988); *Leal v. State*, 782 S.W.2d 844 (Tex.Cr.App. 1989). We would reach the same conclusion even in the absence of the testimony of Darryl Beckham. Appellant's fourth pro se point of error is overruled.

■ In Amicus Curiae's first point of error they argue the evidence was insufficient to support the death sentence imposed via the punishment phase issue of future dangerousness. In resolving whether the evidence supports the jury's affirmative answer to the second special issue, we must look at all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

In the instant case, neither side presented evidence at the punishment phase of appellant's trial. The state requested that all evidence admitted at the guilt-innocence stage of the trial be admitted for the jury's consideration at punishment. After that, both sides closed and rested at punishment.

This Court has held that the facts of the crime alone as proven during the first stage of the trial can be sufficient to support affirmative findings to the special issues at the punishment stage of a capital murder trial. *O'Bryan v. State*, 591 S.W.2d 464, at 480 (Tex.Cr.App.1979); *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App. 1983), cert. denied 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752; *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986), cert. denied 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 407 (1987); *Anderson v. State*, 717 S.W.2d 622, at 634 (Tex.Cr.App.1986); *Drew v. State*, 743 S.W.2d 207 (Tex.Cr.App.1987); *Sosa v. State*, 769 S.W.2d 909, at 912 (Tex.Cr.App. 1989); and *Valdez v. State*, 776 S.W.2d 162, at 166 (Tex.Cr.App.1989). The circum-

stances of the crime may provide greater probative evidence of a defendant's probability for committing future acts of violence than any other relevant to the second special issue. E.g., *O'Bryan v. State, supra*. This is especially true when there is no evidence introduced by the defense in mitigation of the state's evidence.

▉ The facts in the instant case show the calculated nature of appellant's acts and the forethought with which he coldly planned, and then recruited someone to carry out, the murders of Kenneth Franks and Gayle Kelley for the respective purposes of revenge and remuneration. Prior to the murders, appellant insured the life of Gayle Kelley, and then told Maria Qasem, "If anything happens to Gayle, I'll get the money." In the presence of Karim Qasem, appellant and David Wayne Spence discussed the plot to get rid of Kelley. At that time, appellant promised Spence payment for the acts. After the murder occurred, appellant calmly told his insurance agent, "The girl that was here, that you sold insurance to, she was supposed to be with them." The testimony of Darryl Beckham, quoted earlier in this opinion, also revealed the calculated nature with which appellant and Spence planned the murders. This cool calculation of appellant is probative evidence of his propensity to commit future acts of violence. *O'Bryan v. State*, 591 S.W.2d, at 480, and cases cited therein; *Anderson v. State*, 717 S.W.2d, at 634; and *Valdez v. State*, 776 S.W.2d, at 167.

The facts of the instant case also reveal the remorselessness of appellant after these murders were carried out. These facts reveal a wanton and callous disregard for human life. *O'Bryan v. State*, 591 S.W.2d, at 481. On the day after the murder, appellant told Willie Tompkins that his victims "got what they deserved." Appellant told Tompkins about Kenneth Franks, "I don't like him. I hated him." To Tompkins, appellant appeared very serious.

Afterwards, in the presence of Maria Qasem, appellant was reading a newspaper account of the murders and laughing. Appellant told Maria, "Gayle Kelley's boyfriend got killed.... One of them should have been Gayle ... because he would be rich now. ... he was glad to have them killed. ... that they deserved it and he wished he would have done it." Appellant also confronted Karim Qasem with these newspaper accounts. Karim Qasem testified that appellant was laughing and excited, "Gayle's boyfriend got killed last night.... Gayle was supposed to be with him, you know.... I don't know why she wasn't.... She wouldn't live for long.... Gayle would die just like them; she won't live for long." To Karim Qasem, appellant appeared disappointed that Gayle Kelley was not with the victims on the night of the murders.

Approximately a week after the murders, appellant was discussing them with Gayle Kelley. Appellant told her that, "Franks got what he deserved.... Franks was not allowed to die quickly, he was made to suffer, stabbed a lot of times around the heart." These facts, which proved appellant showed no remorse for his actions in bringing about the deaths of the victims, also establish that appellant may have a propensity to commit future acts of violence. *Williams v. State*, 668 S.W.2d 692, at 696 (Tex.Cr.App.1983); and *Turner v. State*, 698 S.W.2d 673, at 676 (Tex.Cr.App. 1985).

Evidence at trial also showed appellant committed extraneous offenses. The facts proved appellant was willing to see others murdered to carry out his plans for remuneration from the death of Gayle Kelley, which indicates a propensity towards violent future actions. *O'Bryan v. State*, 591 S.W.2d, at 480, and cases cited therein.

Around the time, and after, the murders, appellant spoke to others about his desires to see others killed or injured. Patti Pick testified appellant would come and visit her at the store where she worked. One evening, a stocker was "bad-mouthing" her, whereupon appellant stated, "I don't like him. And I'm going to do something to him.... I'll have someone do it. I know people that do that sort of thing and if you have money you can have anything." On another occasion, a friend of hers who was

intoxicated was speaking to her when appellant came to the store. Appellant told her, "Tell me if he upset you, you know, I'll do something to him. I'll—I'll go get in my car and wait for him to come out and I'll run over him." Patti Pick could not recall if these incidents happened before or after the murders, only that they occurred around that time.

Patti Pick also testified that she spoke to appellant in November, 1983, approximately sixteen months after the murders. Appellant told her he was going home to Jordan, but first he was coming to Waco to get even with Truman Simons, Kabena Reed and Willie Tompkins. He told Pick that he should have killed Reed a long time ago, and that Reed was the "reason everything bad happened to him ... even the lake murders."

After appellant made the second insurance premium payment, he told Karim Qasem about Gayle Kelley, "wait and see, she will die just like them." In September 1982, after his arrest and release, appellant told Maria Qasem that he was mad at Kelley and was "going to pay her back"; that he was mad at Kelley for "putting him in jail"; and he was going to "kick her ass." "He said he didn't really have to do it, he had friends to do it." Karim Qasem also testified that appellant gave alcohol to minors from the Methodist Children Home, and that he gave marijuana and pills to Gayle Kelley while she was a resident of the Home.

Even though these extraneous offenses were unadjudicated, they still indicate appellant's propensity to commit acts of violence in the future. *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984); *Anderson v. State*, 717 S.W.2d, at 634. Even though some of these offenses occurred after the commission of the instant offense, they are still probative of appellant's predisposition to violence. *Davis v. State*, 597 S.W.2d 358 (Tex.Cr.App.1980); and *Anderson v. State, supra.*

All of these factors, appellant's cool and calculated approach to the commission of these crimes, his utter lack of remorse and wanton disregard for human life, and the

extraneous offenses, lead us to conclude that the factfinder in the instant case had sufficient evidence before it to decide beyond a reasonable doubt that appellant represented a continuing threat to society. Amicus Curiae's first point of error is overruled.

In appellant's first and second pro se points of error, he argues the trial court erred when it denied his motion to dismiss the indictment in violation of Art. 32A.02 & 1.05, V.A.C.C.P., Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Art. I, § 10 of the Texas Constitution; and that the trial court erred to accord appellant a speedy trial under Art. 32A.02 & 1.05, V.A.C.C.P., the Sixth Amendment to the United States Constitution, and Art. I, § 10 of the Texas Constitution. In Meshell v. State, this Court held Art. 32A.02 & 1.05, V.A.C.C.P., to be unconstitutional as violative of the doctrine of separation of powers. As a result, appellant's first and second pro se points of error will be evaluated solely on constitutional grounds.

■ Although the Texas and Federal rights to speedy trial are separate and distinct, interpretation and application of the Sixth Amendment right to speedy trial by the federal courts serve as a useful guide to the interpretation of the Texas constitutional right to speedy trial. *Chapman v. Evans*, 744 S.W.2d 133 (Tex.Cr.App.1988). Also, in his brief, appellant offers no separate and distinct analysis of his argument on Texas constitutional grounds.

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court established a balancing test of four factors to determine whether an accused has been denied a speedy trial. In each individual case, the Court requires consideration of four factors: (1) length of delay; (2) reason for the delay; (3) appellant's assertion of that right; and (4) prejudice to appellant resulting from that delay. *Barker*, 92 S.Ct., at 2190; *Chapman*, 744 S.W.2d, at 136; *Cook v. State*, 741 S.W.2d 928, at 940 (Tex.Cr.App.1987).

In the instant case, the murder occurred on July 13, 1982. Appellant was initially arrested on a criminal complaint on September 13, 1982, the day after he made his statement to Gayle Kelley at the fast food restaurant. He was released on September 18, 1982, and the complaint was dismissed on September 20, 1982. Appellant was indicted in the instant offense, along with his co-defendants Spence and the Melendez brothers, in November of 1983. He was subsequently re-indicted on November 15, 1984. It was on this latter indictment that appellant was ultimately tried, beginning in February of 1985.

Turning first to the matter of the delay that occurred before appellant was indicted, we note that the state is permitted time in which to investigate the offense prior to securing an indictment. In *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Court explained that "to prosecute a defendant following preindictment, investigative delay, ...," does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 97 S.Ct. at 2051. The Court concluded, "Where finding that only reason government postponed action was to await results of additional investigation was supported by prosecutor's representations that investigation continued during delay, compelling defendant, who testified he lost testimony of two material witnesses due to more than 18 month delay between offense and indictment, to stand trial would not be fundamentally unfair." *Lovasco*, at 2052.

At the hearing to perfect appellant's Bill of Exceptions, the investigating officer, Truman Simons, testified that although he had probable cause to swear out a complaint on September 13, 1982, the case against appellant was not ready to go the grand jury until November of 1983. The prosecuting attorney, Vic Feazell, also testified that the investigation of appellant continued, not only until the grand jury hearing in November of 1983, but also up until the case went to trial in February of 1985. Any delay from the commission of the offense until appellant's indictment was due to the state's investigation of a complex matter.

 The fact that appellant was initially charged by complaint in September of 1982, and subsequently had those charges dismissed one week later, does not militate against this conclusion. Though the state had probable cause to believe appellant was involved in the murder of Jill Montgomery by virtue of his inadvertent statement to Gayle Kelley and Patty Dies, the record in the instant case supports the testimony of Simon and Feazell that much investigation and groundwork was necessary before this case was ready for the Grand Jury to hear evidence. It was apparently for that reason that the complaint against appellant was dismissed so soon after it was filed. As the Court held in *United States v. Mac-Donald*, 456 U.S. 1, 102 S.Ct. 1497, at 1501, 71 L.Ed.2d 696 (1982), the time between a good faith dismissal of criminal charges and filing of new charges is not to be considered on speedy trial right. This Court will not include the pre-indictment delay in its evaluation of appellant's speedy trial claim. *Lovasco, supra;* and *Mac-Donald, supra.*

 Therefore, the length of delay to be considered in the instant case is the fifteen months from the return of the first indictment against appellant and his trial pursuant to his subsequent reindictment. This delay does not *per se* show a denial of a right to a speedy trial. *Dawson v. State*, 510 S.W.2d 316, at 319 (Tex.Cr.App.1974); *Cook v. State*, 741 S.W.2d 928, at 940 (Tex. Cr.App.1987). In light of the complex nature of the "conspiracy to commit capital murder" nature of the case against appellant, a fifteen month delay is not intolerable. The "delay that can be tolerated for an ordinary street crime is considerably less than for a serious, complex conspiracy charge." *Barker v. Wingo*, 92 S.Ct., at 2192. We find the period of fifteen months in the instant case does not represent an undue delay. We will review the record in light of the other three factors.

Examining the second factor in the *Barker v. Wingo* analysis, we note that part of the reason for the delay was that

appellant's co-defendant, Spence, was tried first, during July of 1984. Appellant attempted to establish that this was purely a decision by the State. However, testimony at the hearing on the Bill of Exceptions indicates this was a decision of the trial court. The prosecuting attorneys testified that they felt they had the stronger case against Spence, but that they did not consult with the trial court on the order in which the cases were to proceed to trial. Appellant's trial attorney testified at the Bill hearing that he felt the State was trying to secure a tactical advantage over appellant by trying the case against Spence first, but there is no evidence in the record to support this conjecture. It is difficult to conclude from the record that the State was maneuvering for a tactical advantage and was therefore responsible for the delay. A neutral reason for the delay, not directly attributable to the prosecution, means the delay should be weighed less heavily in the balancing. *Barker v. Wingo*, 92 S.Ct., at 2192; *Chapman v. Evans*, 744 S.W.2d, at 136.

As to the third element of the *Barker v. Wingo* analysis, appellant has clearly asserted his right to a speedy trial by virtue of his motions to dismiss for failure to provide a speedy trial.

In analyzing the facts in light of the fourth prong of the *Barker v. Wingo* test, we must next determine whether any delay in bringing appellant to trial resulted in any prejudice to him. Appellant has failed to make a showing of prejudice as a result of the delay.

Appellant contends that he was prejudiced because the delay impaired the memories of many witnesses, caused evidence to be lost, deprived appellant of many witnesses, interfered with appellant's ability to defend himself and caused witnesses to be biased. First, at the hearing on appellant's Bill, the prosecutor testified there were no memory failures that were not normal in any prosecution. Appellant contends that Patty Pick couldn't recall many events, and that Maria and Karim Qasem and Cynthia Bernal had memory problems. Our review of the record does not support this conclusion. Pick and the Kasems were unequivocal in their recall of appellant's actions and words. Pick had some trouble remembering if appellant's threats against other people occurred before or after the murders at the Lake, but that was all. Bernal gave some contradictory answers on cross-examination, but this evinced no memory problems on her part. We turn to appellant's other claims of prejudice.

He alleges that evidence beneficial to him was lost, but he does not specify what that evidence was or how he may have been harmed. Appellant complains the delay caused witnesses to be biased towards him, but he does not say how and the record does not support his claim. Appellant claims that the delay interfered with his ability to defend himself, but fails to specify how, or support his argument with the record.

He asserts that he was deprived of witnesses, specifically the mechanic, who worked on Spence's car the day after the murder, and Christine Juhl, Spence's girlfriend. The mechanic died prior to trial, but there was no proof that he died before or after appellant's indictment. Also, testimony of whether Spence's car needed work on the day after the murders would have little if any relevance to the condition of the car on the day of the murders, especially in light of Gilbert Melendez' unimpeached testimony that he and Spence used the car on the night of the murders. Appellant's attorney testified that he contacted Juhl's brother in Colorado by phone prior to trial, who informed him that she did not want to talk to him and wanted no part of appellant's trial. There is nothing in the record to indicate when she moved to Colorado or to indicate that her attitude was a result of the delay. In appellant's second pro se supplemental brief, he quotes extensively from her grand jury testimony. We cannot agree that any of it casts doubt on the conversations between appellant and Spence that were witnessed by Karim Qasem and Gilbert Melendez. We are hard pressed to accept any of it as being exculpatory or otherwise beneficial to appellant.

We hold that in light of the foregoing analysis, any delay in bringing appellant to trial was not violative of his constitutional rights under the federal or the state constitution. *Cook v. State*, 741 S.W.2d, at 940.

Appellant's first and second pro se points of error are overruled.

In appellant's forty-ninth pro se point of error, he argues that his right to due process under the Fourteenth Amendment to the United States Constitution and his right to Due Course of Law under Art. I, § 10 of the Texas Constitution were denied him. Appellant alleges the state failed to disclose exculpatory evidence, knowingly suppressed prior inconsistent statements and introduced perjured testimony. We find that appellant's claims are unfounded.

Appellant alleges that the parents of Kenneth Franks and Gayle Kelley perjured themselves over the reasons why they were in the Methodist Children's Home. These are little more than bald-faced assertions in appellant's brief which we shall not deign to review in our opinion. They are definitely unsupported by the record. Appellant also alleges that exculpatory and prior inconsistent statements would show: Gayle Kelley did not live with Patty Dies at the time of the burglary (her own testimony at trial showed that she moved in with Patty on the day of the reporting of the second burglary); the actual date that appellant's store was placed off-limits to the kids at the Children's Home (the record indicates appellant had complete access to the records of the Home prior to trial); that Christine Juhl would have exculpatory testimony about appellant's alleged conversations with others (there is nothing in the record to show the state did anything to deny appellant's access to Juhl); and that the state kept him from George Merilian's testimony (this is also unsupported by the record.).

Appellant's claims of denial of his due process and due course of law rights are without merit. Appellant's forty-ninth pro se point of error is overruled.

The judgment of the trial court is reversed and the cause is remanded to that court.

McCORMICK, P.J., concurs in the result.