

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00101-CR

———————————————————

JERMAR JAMIE FULLER, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from the 30th District Court
Wichita County, Texas
Trial Court No. 58,156-A

---

Before Birdwell, Wallach, and Walker, JJ.
Opinion on Rehearing by Justice Walker

## OPINION ON REHEARING

After considering appellant Jermar Jamie Fuller's motion for rehearing, we deny the motion, withdraw our April 29, 2021 opinion, and substitute the following opinion in its place. We deny Fuller's motion for en banc reconsideration as moot. *See Brown v. State*, 212 S.W.3d 851, 856 n.1 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (op. on reh'g).

Fuller appeals from his capital-murder conviction, arguing in one issue that his constitutional right to a speedy trial was violated. Although the length of the pretrial delay was significant and the reasons for the delay weigh against the State, Fuller's late assertion of his right and his failure to demonstrate prejudice arising from the delay weigh against a conclusion that Fuller's right was violated. On balance, and viewing the facts in a light most favorable to a finding that the right was not violated, we affirm the trial court's determination that Fuller's right to a speedy trial was not violated.

## I. BACKGROUND

### A. OFFENSE FACTS

Fuller does not challenge the sufficiency of the evidence to support his conviction, but because our speedy-trial analysis considers any prejudice to his defense arising from the pretrial delay, we will recount the facts of the offense in broad strokes.

Bertilda Carpenter lived across the street from her son, Samuel Rankin. On the evening of October 9, 2016, Carpenter heard banging noises and saw a "black guy" running out of her son's house. The next morning, Carpenter saw a tall, "black gentleman" get out of a red car and go into her son's house. The man left quickly. Carpenter later went into her son's house and found that her son and his friend, David Phillips, had been shot and killed. Several 9-millimeter cartridge casings, bullets, and two cell phones were found near the bodies. Later, forensic testing showed that Rankin and Phillips had been killed the night before.

The same morning that Carpenter discovered that her son and Phillips had been murdered, Trooper Jacob Roche attempted to pull over a speeding red car; the driver evaded the stop, crashed into a brick wall, and ran from the wreck. Roche caught the driver, who was identified as Fuller. Fuller matched the description of the man Carpenter had seen enter her son's house the morning after the murders. When Roche caught him, Fuller was carrying a duffel bag with $4,000; Roche found two guns (a loaded .380 semiautomatic pistol and an unloaded 9-millimeter pistol), marijuana, and two cell phones (an iPhone and a "burner phone") in the wrecked car. The .380 semiautomatic appeared to have blood on it. Roche arrested Fuller for unlawfully carrying a weapon, possession of a stolen firearm (the 9-millimeter), and evading arrest; Fuller consented to a search of his two phones.

During a recorded jail call to his father, Fuller stated that the police had "got that iron." When he called Sierra Moore, his girlfriend, he stated that he had "f---ed

3

up" and that he might be confined "for life" because he had been "caught with that iron." In a later call to Moore, he repeatedly denied having anything to do with the murders, but he also told her to text "that b---h [i.e., his other girlfriend, Shantalle Vallier] everything must go." Moore dutifully messaged Vallier and told her that "Jermar is in jail. . . . He told me to tell you everything must go . . . . I guess he's talking about some guns." Vallier contacted Fuller's brother and gave him a gun that she had found at her apartment. This gun was identified as one of Rankin's guns. Fuller told Vallier that he had intended to kill only one of the men but that he decided to kill both so there would be no witnesses; Vallier, in turn, recounted this information to the detective investigating Rankin's and Phillips's murders.[1]

Carpenter later identified the wrecked car as the car that had been parked in front of her son's house the morning after the murders. The cartridges and bullets found at the crime scene were tested and they matched the 9-millimeter that had been found in Fuller's car. The blood on the .380 semiautomatic found in Fuller's car matched Phillips's DNA. Bullets found during Rankin's and Phillips's autopsies were determined to have been fired from the stolen 9-millimeter. The investigation also revealed that Fuller's burner phone had connected to a cell-phone tower near the

---

[1]At trial, Vallier denied that Fuller had said this, but the investigating detective affirmed that she had reported her conversation with Fuller to him. And after Vallier's denial at trial, the State introduced Vallier's grand-jury testimony that Fuller had told her he had shot two men.

crime scene both on the night of the murders and the next morning when Carpenter had seen the red car at Rankin's house.

## B. SPEEDY-TRIAL FACTS

### 1. 2016

The State submitted the .380 semiautomatic for DNA testing on October 26, 2016—seventeen days after the murders. Fuller was formally arrested for capital murder on November 1, 2016, and was indicted that December. *See* Tex. Penal Code Ann. § 19.03(a)(7)(A). On December 27, 2016, the State announced it was ready for trial. The trial court set the case for a May 14, 2018 trial. The record does not reflect that Fuller objected to this setting. On December 29, 2016, Fuller requested that the State produce the required discovery items. *See* Tex. Code Crim. Proc. Ann. art. 39.14(a).

### 2. 2017

In January 2017, the State disclosed to Fuller that it had "Reports" on Fuller's cell phones. In this disclosure, the State notified Fuller that it was his "duty . . . to make an appointment to access and review these items." In February 2017, Fuller received a logical extraction report from the iPhone and photos of the burner phone's contents—"contacts, call details, text messages, etc."

5

### 3.  2018

On March 29, 2018, the State notified Fuller that a logical extraction report was available for the burner phone as well as for the iPhone.  The State hand-delivered an electronic copy of the extraction report to Fuller on May 22, 2018.

As the State was preparing for the May 2018 trial, the prosecutor discovered that the DNA testing on the apparent blood found on the .380 semiautomatic, which had been requested in October 2016, had not been completed.  The prosecutor believed that both the State and Fuller had a need for the DNA evidence:

> Certainly from the State's perspective, the potential of the victim's blood being contained on the firearms would be self-evident of the importance of that.  From the defense perspective, of course, it could potentially . . . rule out the victim's blood and also perhaps undermine the credibility of the State's ballistics testing.

The State contacted the lab, requested expedited DNA testing, and began "follow[ing] up on it periodically."

The record is unclear when the May 2018 trial setting was continued, but Fuller first asserted his right to a speedy trial on November 13, 2018—two years after his arrest—and requested a preferential trial setting.  He argued that he had been prejudiced because the delay had caused him "anxiety and concern."  Fuller quickly withdrew his speedy-trial complaint after the trial court apparently agreed to preferentially set the case for February 2019.

## 4. 2019

At a February 1, 2019 status hearing, the State recognized that the DNA testing was still outstanding and asserted that the results could be expected in March 2019. Both the State and Fuller represented that they were not ready for a February 2019 trial, mainly because of the outstanding DNA testing and because the district attorney had not decided whether to seek the death penalty against Fuller. The trial court removed the case from the February 2019 trial docket to allow for the DNA testing and set a March 29, 2019 status hearing. Fuller had no objection to removing the case from the February 2019 trial docket.

On February 8, 2019, the State notified the trial court that it would not seek the death penalty. *See id.* art. 1.13(b); Tex. Penal Code Ann. § 12.31(a).

On March 5, 2019, while DNA results were still outstanding, Fuller reasserted his desire for a speedy trial. He argued that because the State had decided not to seek the death penalty, there was no obligation to test all biological evidence, obviating the need for further delay. *See* Tex. Code Crim. Proc. Ann. art. 38.43(i)–(j). At the March 29, 2019 status hearing, the State asserted that the DNA testing would be available in June 2019. The trial court specially set the case for trial on the first available date—October 21, 2019. Fuller did not expressly object to the October 2019 setting, but he did assert that he was "ready on this case as it currently stands." Apparently, all parties treated the new trial date as addressing the reasserted dismissal motion, which no party mentioned at the status hearing, and as allowing the

7

completion of the DNA testing. In any event, the trial court never expressly ruled on the reasserted motion, and Fuller never asked that it do so.

At a July 2019 status hearing, the prosecutor warranted that the DNA testing would be complete "no later than" August 2019, which occurred. The trial court set another status hearing for September 13, 2019, "with the anticipation that hopefully by that point we have an idea of at least a final confirmation of the lab issues" to give "a better idea with regards to the current trial date and the ability to move forward at that point." The DNA testing was not discussed at the September 13 hearing, presumably because all parties knew it had been completed; instead, the hearing addressed whether Vallier's grand jury testimony could be disclosed to Fuller.[2]

In late August and September 2019 and after the trial court had appointed Lance Sloves as a defense expert on cell-phone forensic analysis,[3] Fuller informed the State that he wanted to examine the "forensic image[s]" of the cell phones. Based on confusion about the difference between a forensic image and the previously disclosed extraction reports,[4] the prosecutor did not ask the police department about forensic images until October 3, 2019—less than three weeks before trial.

---

[2]The trial court ruled that the majority of her testimony could not be disclosed, and Fuller does not challenge that ruling on appeal.

[3]Fuller requested the appointment of such an expert on August 30, 2019—shortly after the DNA testing was completed.

[4]A logical extraction is a copy of a phone's contents, excluding any application data. A forensic image may show deleted data that a logical extraction does not.

On October 4, 2019, Fuller asked to continue the trial date to examine the forensic images. At the hearing on the continuance motion, Fuller conceded that he and the prosecutor had only recently learned that forensic images of the phones existed and that an examination of the images would take "more than 20 days." The State opposed the continuance, arguing that Fuller had delayed investigating the previously disclosed cell-phone extraction reports. The trial court continued the trial date until March 9, 2020, and found that although the cell-phone images were available, the State had not intentionally caused the delay. The trial court stated that the delay had been due to "technical issues" and that the trial court had "made every reasonable effort to ensure that [a] speedy trial right is obtained, that it was obtained, and is still going to be obtained."

The State determined that the forensic images had not been "maintained" when the extraction reports had been prepared for Fuller's cell phones. However, the police department was able to provide the forensic images, and the State notified Fuller on November 26, 2019, that the images were available. Fuller did not review the images until December 20, 2019.

### 5. 2020

On February 11, 2020, Fuller moved to dismiss the indictment based on his assertion of a speedy-trial violation, focusing on the State's responsibility for the delay. The State responded that Fuller's dismissal request should be denied because Fuller "acquiesced in much more than half of the delay," Fuller "caused other delay," Fuller

did not show "any prejudice arising from the delay," and the pre-October 2019 delay was caused by the State's "justified pursuit of forensic DNA testing." At the hearing on Fuller's motion, a jail administrator testified that although Fuller had been jailed on the capital-murder charge since November 1, 2016, he had also been held for and convicted of forgery and sentenced to six years' confinement on May 16, 2018; had a "capias pro fine for possession of marijuana under 2 ounces"; and had a "bond for unlawful carrying of a weapon." Based on Fuller's motion, the State's response, the parties' presented evidence, and the prior procedural history of the case, the trial court denied the motion.

Fuller's trial began on March 9, 2020. During trial and after the State rested its case, Fuller "reurge[d]" his motion to dismiss and asserted that the speedy-trial violation resulted in C. W. Hoyer being unavailable to testify because he had died on November 22, 2017. Hoyer was a neighbor of Rankin's who had heard gunshots on the night of the murder, and Fuller believed he would have testified that a different type of car, not Fuller's, left the scene shortly thereafter:

> [Fuller] expect[s] that if [Hoyer] would have been alive to testify and would have been subpoenaed to testify in this case, . . . based on police reports, . . . he would have testified to something of the effect of on 10/9/2016, around 2000 hours, he was sitting on the screened porch with his next-door neighbor, heard three shots, a pause, three more shots. He described the shots as being muffled.
>
> About four to five minutes later, he observed a new model black Ford pickup with shiny mag wheels heading southbound on North Broadway. He advised the pickup truck appeared to be speeding because it hit a dip in the intersection of North 2nd and Broadway. He

10

advised that he could tell the car was extremely clean, it had mag wheels, because the street light was shining on the car, and it made the car stand out. He advised the truck continued southbound towards the river. And [Fuller expects Hoyer] would testify consistent with that police report if he were alive and if he were subpoenaed in this case.

The trial court denied the motion.

The jury found Fuller guilty of capital murder, and the trial court sentenced him to life confinement without the possibility of parole. *See* Tex. Penal Code Ann. § 12.31(a)(2).

## II. RIGHT TO A SPEEDY TRIAL

In his appellate issue, Fuller argues that the trial court erred by denying his dismissal motions because the State "had continual problems getting its evidence ready for trial," resulting in trial not being held until three years and five months after his arrest. After discussing the applicable balancing factors, Fuller concludes that the delay resulted in a denial of his right to a speedy trial.

### A. STANDARD OF REVIEW

We review the legal components of the trial court's denial of Fuller's motion de novo and the factual components for an abuse of discretion. *See Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008); *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002). Because the trial court did not enter findings of fact or conclusions of law, and none were requested, we presume that the trial court resolved any disputed fact issues in the State's favor and we must defer to such presumed findings. *See State v. Munoz*, 991 S.W.2d 818, 821 (Tex. Crim. App. 1999). Our de

11

novo review, however, is governed by a well-established, four-factor balancing test that weighs (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his speedy-trial right, and (4) prejudice suffered by Fuller as a result of the delay. *See Barker v. Wingo*, 407 U.S. 514, 529 (1972); *see also Johnson v. State*, 954 S.W.2d 770, 771 (Tex. Crim. App. 1997) ("The balancing test as a whole, however, is a purely legal question . . . reviewed *de novo*."). No single factor is determinative of a speedy-trial violation, and both the State's and Fuller's conduct must be weighed. *See Barker*, 407 U.S. at 530, 533; *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003).

The State had the burden to justify the delay; Fuller had the burden to prove his assertion of the right and prejudice. *See Barker*, 407 U.S. at 531. Fuller's burden varies inversely with the State's degree of culpability for the delay. *See Cantu*, 253 S.W.3d at 280–81.

## B. BALANCING FACTORS

### 1. Length of the Delay

Although the length-of-delay factor is described as the first of the balancing test, it actually operates as a gatekeeper factor: "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. In short, to trigger an analysis of the other three factors, we must calculate the period of delay and determine if its length is "presumptively prejudicial." *Id.*; *see Doggett v. United States*, 505 U.S. 647, 651–52 (1992); *Zamorano*, 84 S.W.3d at 648. Our calculation begins at the time Fuller was

12

arrested and ends at the time of trial. *See Zamorano*, 84 S.W.3d at 648–49; *State v. Page*, No. 05-18-01391-CR, 2020 WL 1899453, at *4 (Tex. App.—Dallas Apr. 17, 2020, no pet.) (mem. op., not designated for publication). Courts generally deem a delay approaching one year to be unreasonable enough to trigger an analysis of the remaining *Barker* factors. *See Balderas v. State*, 517 S.W.3d 756, 768 (Tex. Crim. App. 2016).

The State concedes that the length of the delay—over three years—is sufficient to trigger an analysis of the remaining factors. We agree that this delay goes well beyond the minimum to trigger the remainder of the balancing test, and we conclude that this factor weighs against the State and in favor of finding a speedy-trial violation. *See, e.g.*, *Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003); *Dragoo*, 96 S.W.3d at 314; *Thames v. State*, No. 02-17-00295-CR, 2019 WL 237556, at *6 (Tex. App.—Fort Worth Jan. 17, 2019, no pet.) (mem. op., not designated for publication); *Mendez v. State*, 212 S.W.3d 382, 385 (Tex. App.—Austin 2006, pet. ref'd) (substituted op.).

## 2. State's Justification for the Delay

Our evaluation of the second factor uses a sliding scale by which we assign different weights to different reasons for the delay. *See Barker*, 407 U.S. at 531; *Balderas*, 517 S.W.3d at 768. If the delay resulted from more neutral reasons— negligence or overcrowded courts—this factor will weigh against the State but less heavily. *Barker*, 407 U.S. at 531; *Balderas*, 517 S.W.3d at 768. If the delay resulted from a valid reason—a missing witness—this factor will not weigh against the State.

*Munoz*, 991 S.W.2d at 822. Deliberate conduct by the State will, of course, weigh heavily against the State. *See Balderas*, 517 S.W.3d at 768. In the absence of an assigned reason, we may not presume either that the State acted deliberately to prejudice the defense or that there was a valid reason for the delay. *See id.* But we do consider whether the State or Fuller was more to blame for the delay. *See id.* Again, the State bears the burden to show that the delay was justified. *See Shaw*, 117 S.W.3d at 889 n.3.

Fuller does not argue that the delay was a result of deliberate conduct; instead, he contends that the delay was due to the State's "negligence in preparing its evidence," which weighs against the State but not heavily. The State argues that the delay from November 2016 to October 2019 was a result of a DNA laboratory backlog and of Fuller's agreement to wait until DNA testing could be completed, which cannot be weighed against the State.

The majority of the delay—the almost three years between the date of the offense and the completion of DNA testing—was a result of delayed DNA-test results. The State asserts the delay was caused by a "laboratory backlog," but the record is not so clear. At none of the status hearings was there evidence that a backlog was to blame. Rather, the prosecutor stated only that the laboratory simply had not completed the task, not that the laboratory's work load was to blame. In fact, the prosecutor indicated that if the State had decided to seek the death penalty against Fuller, the laboratory would have "move[d] at a quicker speed." In any event, the

14

three-year delay was caused by the laboratory's not completing the testing for whatever reason. Although the State did not check the status of the testing until shortly before the May 2018 trial setting, there is no clear indication that the testing would have been completed sooner if the State had checked earlier. Indeed, even after the State began monitoring the laboratory delay, the testing was not completed for an additional fifteen months.

The second portion of the delay—from October 2019 to the March 9, 2020 trial—was due to a dispute over the cell-phone evidence. The State disclosed that it had reports from Fuller's cell phones approximately three months after Fuller's arrest. One month later, Fuller received a logical extraction report for the iPhone and photos of the burner phone's contents. A year later, the State notified Fuller that a logical extraction report was available for the burner phone as well. Seventeen months later, Fuller requested and obtained the appointment of a forensic cell-phone expert. Fuller then asked to examine the cell phones' forensic images. Confused by the request, the State did not ask the police department about the images until shortly before the October 2019 trial date. As a result, Fuller sought to continue the trial, which was granted over the State's opposition until March 2020. But Fuller recognized that he and the prosecutor had only recently discovered the existence of the forensic images, and the trial court noted that any delay arising from the cell-phone evidence was due to "technical issues" and not due to any bad intent by the State.

We conclude that the delay in DNA testing weighs against the State but not heavily. *See, e.g.*, *Vega-Gonzalez v. State*, No. 03-19-00413-CR, 2020 WL 7051187, at *9 (Tex. App.—Austin Dec. 2, 2020, no pet.) (mem. op., not designated for publication). A three-year delay in DNA testing when requested by the State in a murder investigation is unreasonable. But neither can it be considered deliberate conduct by the State. It is more akin to negligent conduct that does not weigh heavily against the State. *See, e.g.*, *Barker*, 407 U.S. at 538 (White, J., concurring); *Stiles v. State*, 596 S.W.3d 361, 367 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd), *cert. denied*, 141 S. Ct. 1266 (2021); *Bertrand v. State*, No. 05-14-01368-CR, 2016 WL 409665, at *2 (Tex. App.—Dallas Feb. 3, 2016, no pet.) (mem. op., not designated for publication); *State v. Fisher*, 198 S.W.3d 332, 338–39 (Tex. App.—Texarkana 2006, pet. ref'd).

The delay between Fuller's late August 2019 request for forensic images and the March 2020 trial was partially attributable to Fuller. *See Balderas*, 517 S.W.3d at 768 (citing *Vermont v. Brillon*, 556 U.S. 81, 90–91 (2009)); *Page*, 2020 WL 1899453, at *6. *See generally Dickey v. Florida*, 398 U.S. 30, 48 (1970) (Brennan, J., concurring) ("A defendant may be disentitled to the speedy-trial safeguard in the case of a delay for which he has, or shares, responsibility. . . . [F]or example, . . . an accused cannot sustain a speedy-trial claim when delay results from . . . making dilatory pleadings or motions . . . ."). As the State argued at the hearing on Fuller's motion to continue the October 2019 trial, Fuller failed to request a cell-phone expert until August 2019. But the State also shoulders some of the blame for this delay. The State had an

16

affirmative duty to produce the cell-phone images, which Fuller had asked for in his 2016 discovery request. *See* Tex. Code Crim. Proc. Ann. art. 39.14; *Watkins v. State*, 619 S.W.3d 265, 277–78 (Tex. Crim. App. 2021). Not only did the State fail to timely produce the images, which the trial court found had been available, but the State also did not "maintain[]" them after the extraction reports were prepared.

In summary, forty months elapsed between Fuller's arrest and his trial. Thirty-four of those months were caused by neutral reasons, which weigh against the State but not heavily. *Barker*, 407 U.S. at 531. Six months weigh against neither Fuller nor the State because of the State's delayed production of the cell-phone images and Fuller's delayed request for a cell-phone expert. *See Thames*, 2019 WL 237556, at *8. Even so, the majority of the delay weighs in favor of a finding that Fuller's speedy-trial right was violated.

### 3. Fuller's Assertion of the Right

Fuller bore the burden to show that he timely asserted his right. *Barker*, 407 U.S. at 531. As we have recounted above, Fuller first asserted his right to a speedy trial in November 2018—two years after his arrest—but he quickly withdrew the argument. Fuller did not object to the trial court's decision to remove the trial from the February 2019 docket in order to allow completion of the DNA testing. Fuller did not reassert his right to a speedy trial until March 2019, which led to a new trial setting for October 2019. Fuller did not object to the trial court's failure to explicitly rule on the speedy-trial issue and did not clearly object to this new trial setting. Fuller

17

later sought a continuance of the October 2019 date, which was granted until March 2020, in order to review the cell-phone images that the State had not produced until November 26, 2019. The trial court found that this delay was due to "technical issues." Fuller did not raise his right to a speedy trial again until February 2020—one month before his trial date—when he moved to dismiss the indictment.

We conclude that this factor weighs against Fuller. *See, e.g.*, *Balderas*, 517 S.W.3d at 771; *Smith v. State*, 436 S.W.3d 353, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Macon v. State*, No. 02-05-00195-CR, 2007 WL 79714, at *6 (Tex. App.—Fort Worth Jan. 11, 2007, no pet.) (per curiam) (mem. op., not designated for publication). Fuller delayed raising his right to a speedy trial, choosing instead to agree to continue the trial in order to wait for the DNA testing. Particularly compelling is the fact that two years passed after Fuller's arrest before he raised the issue for the first time. *See Macon*, 2007 WL 79714, at *6 (citing *Kelly v. State*, 163 S.W.3d 722, 730 (Tex. Crim. App. 2005)). Although it is the State's duty to bring a defendant to trial in a timely manner, it is the defendant's burden to assert the right if violated. *See Cantu*, 253 S.W.3d at 282. And Fuller's final assertion of the right sought dismissal of the indictment, which weakens his speedy-trial claim "because it shows a desire to have no trial instead of a speedy one." *Id.* at 283; *see Balderas*, 517 S.W.3d at 771.

18

#### 4. Prejudice to Fuller Arising from the Delay

Prejudice to Fuller must be assayed in light of the dangers the speedy-trial right was designed to prevent: (1) oppressive pretrial incarceration, (2) increased anxiety and concern for the accused, and (3) impairment of the accused's defense. *See Dragoo*, 96 S.W.3d at 315 (citing *Barker*, 407 U.S. at 532). Fuller concedes that the first two dangers are not implicated here "because [he] was incarcerated for forgery and no evidence was offered regarding his anxiety from the delay." But he asserts his defense was prejudiced by Hoyer's death during the delay and because a police detective could not remember "a key detail" at trial.

Fuller cannot rely on Hoyer's death to establish prejudice. Hoyer died one year after Fuller's arrest and well before Fuller asserted his speedy-trial right had been violated. The absence of Hoyer as a witness cannot be attributed to even the delay in DNA testing. *See Deeb v. State*, 815 S.W.2d 692, 706 (Tex. Crim. App. 1991); *Thames*, 2019 WL 237556, at *10; *Solano v. State*, No. 12-07-00324-CR, 2009 WL 223111, at *5 (Tex. App.—Tyler Jan. 30, 2009, no pet.) (mem. op., not designated for publication). Further, the fact that Hoyer saw a black pickup drive near the murder scene minutes after shots had been fired had minimal evidentiary value in light of the strong evidence of Fuller's guilt—his confession to Vallier, a ballistics match to the 9-millimeter found in Fuller's car, a DNA match to the .380 semiautomatic also found in Fuller's car, his apparent inculpatory statements to his father and Moore, and the fact that Fuller's burner phone had been near the crime scene on the night of the

murder and the next morning when Carpenter saw Fuller's car in front of her son's house. *See Deeb*, 815 S.W.2d at 706; *Hurdsman v. State*, No. 02-17-00319-CR, 2018 WL 5832116, at *8 (Tex. App.—Fort Worth Nov. 8, 2018, pet. ref'd) (mem. op., not designated for publication).

Nor can Fuller's reliance on the detective's memory lapse supply the requisite prejudice to his defense occasioned by the delay. During his investigation, Detective Brad Love looked into Fuller's theory of who actually committed the murders: Thor Enbysk, a rumored member of a "white supremacy group." Enbysk had been offering to pay for information on the location of "Wedo"; Fuller believed Wedo was Rankin because his street name had been Wedo. Love interviewed Enbysk and determined that "Wedo" referred to a Warren Yoder.[5] Love noted that Enbysk was "in generally poor health" and that he had a verified alibi for the night of the murders. The State had disclosed this information to Fuller in February 2017, before Hoyer's death. During Fuller's cross-examination of Love, Love could not "recall" if he had been able to locate anyone named Warren Yoder. Importantly, Love testified that his investigation found no significant physical evidence tying anyone other than Fuller to the murders.

Fuller argues that the delay in his trial resulted in Love's forgetting whether he had found a Warren Yoder, which he contends would have "cast doubt on . . .

---

[5]Love stated that "Wedo" is "a pretty common street name."

Enbysk's claims that he was not involved in the murders." Fuller never raised this argument to the trial court before trial, after Love's testimony, or during trial when he again moved to dismiss the indictment at the close of the State's case-in-chief. In short, Fuller never informed the trial court that Love's uncertainty about locating Warren Yoder prejudiced his defense and, thereby, violated his right to a speedy trial. Thus, this basis for Fuller's assertion of prejudice was not before the trial court and not preserved for our review. *See* Tex. R. App. P. 33.1(a)(1); *Dragoo*, 96 S.W.3d at 313; *Webb v. State*, 36 S.W.3d 164, 174 n.2 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (op. on reh'g). Even if Fuller had raised this argument to the trial court, the other compelling evidence of Fuller's guilt renders this isolated memory lapse of little evidentiary value and does not meet Fuller's burden to establish prejudice. *Cf. Munoz*, 991 S.W.2d at 829 (holding memory lapses establish prejudice only if they are shown to be related to outcome of case).

Fuller finally contends that prejudice to his defense may be presumed here based solely on the length of the delay. But this argument conflates the first and fourth *Barker* factors. Presumptive prejudice arises in the context of the first gatekeeper factor and dictates whether the remaining three factors must be considered. *Barker*, 407 U.S. at 530. If the delay is close to a year or more, prejudice is presumed such that the remaining factors must be considered, including prejudice to the defense. *See Doggett*, 505 U.S. at 652 n.1. Even if presumptive prejudice is found based on the length of the delay, the defendant still must establish prejudice to

21

his defense in the fourth factor. *See id.* ("We note that, as the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry."). Here, even though the three-year delay is presumptively prejudicial, necessitating a review of the remaining *Barker* factors, Fuller has failed to show specific prejudice to his defense arising from this presumptively prejudicial delay.

This factor weighs against Fuller's assertion that his speedy-trial right was violated.

## III. BALANCING CONCLUSION

Fuller waited for trial more than three years after his arrest for the murders of Rankin and Phillips. The length of delay is presumptively prejudicial, weighing against the State, and triggers an examination of the other speedy-trial factors. The reasons for the delay are myriad, but the main culprit was the unreasonable amount of time the laboratory took to test the apparent blood on the .380 semiautomatic found in Fuller's car. This factor weighs against the State. But Fuller did not diligently assert his speedy-trial right and has failed to establish any prejudice to his defense arising from the delay. These final two factors weigh against Fuller.

Viewing the evidence in the light most favorable to the trial court's ultimate speedy-trial ruling, deferring to the trial court's presumed resolution of the facts, and conducting a de novo balancing analysis, we conclude that Fuller's right to a speedy

trial was not violated. Accordingly, we overrule Fuller's issue and affirm the trial court's judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Brain Walker

Brian Walker
Justice

Publish

Delivered: June 3, 2021