**Opinion issued May 14, 2026**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00750-CR

_____

## DON MICHAEL SNIDER, Appellant

## V.

## THE STATE OF TEXAS, Appellee

On Appeal from Criminal District Court No. 4
Tarrant[1] County, Texas
Trial Court Case No. 1788689

---

[1]   The Texas Supreme Court transferred this appeal from the Court of Appeals for the Second District of Texas.  *See* TEX. GOV'T CODE ANN. § 73.001 (authorizing transfer of cases between courts of appeals).  Under the Texas Rules of Appellate Procedure, "the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court." TEX. R. APP. P. 41.3.  The parties have not cited, nor has our research revealed, any conflict between the precedent of the Second Court of Appeals and that of this court on any relevant issue.

# MEMORANDUM OPINION

A jury convicted appellant, Don Michael Snider, of one count of aggravated sexual assault and one count of prohibited sexual conduct. Having found the habitual offender notice "true," the jury assessed appellant's punishment at eighty-seven years' confinement on each count. In two issues, appellant contends that (1) the State violated its obligations under *Brady v. Maryland*[2] and Article 39.14 of the Texas Code of Criminal Procedure by failing to disclose an immunity agreement to the defense, and (2) his right to a speedy trial was violated. We affirm.

## Background

The complainant, M.S, lived at the Morado Senior Living Center ("senior center"), in Pantego, Texas. M.S., who was eighty-seven years old, suffered from dementia and needed assistance with bathing, changing her diaper, taking her medications, and eating. Charles, M.S.'s older son, hired Anna Tham ("Tham"), a certified nursing aide, and Maxine Hickman ("Hickman"), a caregiver, to care for M.S.

After suffering a fall in October 2021, M.S.'s health began deteriorating quickly. Tham testified that M.S. was skinny, weak, and frail, was unable to care for herself, and seemed close to passing away.

---

[2] 407 S.W.3d 514 (1972).

In the early morning hours of October 23, 2021, a front desk employee of the senior center called Hickman to report a man in M.S.'s room. Hickman called Tham, who was at the facility and getting ready to go home after working overnight with another patient. Tham went to M.S.'s room at around 6:00 a.m. to check on M.S. Tham testified that when she opened the door, she saw appellant, M.S.'s younger son, lying naked next to his mother in her bed, with his genitals close to her. Tham testified that M.S.'s clothing had been pulled up and her diaper had been pulled away, exposing her genitals.

Tham, in shock, screamed at appellant, "Did you sleep with your mom?" Tham testified that appellant responded, "I just want to get closer to her." Tham began taking photos of the scene with her cell phone. The photos were admitted into evidence at trial. Tham testified that she took the photos so that there would be evidence of what appellant had done and he could not deny it. Tham testified that appellant appeared unphased and continued to lie in bed with M.S.

Tham called Hickman. When Hickman arrived, she shouted at appellant to get out of M.S.'s bed. Appellant then left the facility. Tham called Charles and sent him the photos she had taken. Tham took a vaginal and a buccal swab from M.S. Afterwards, Tham and Hickman cleaned M.S. up, changed her clothing, and put her into bed. Tham testified that M.S. was still alive at that time.

Tham testified that M.S. had made prior allegations of being sexually assaulted, but no one at the facility believed her. According to Tham, Charles also knew of M.S.'s prior sexual assault allegations but had attributed them to her dementia.

Hickman testified that in the early morning hours of October 23, 2021, she received a call from the senior center notifying her that M.S.'s son was at the facility. Hickman called Tham and asked her to check on M.S. while Hickman remained on the phone so she could hear what was said. Hickman testified that she heard Tham scream. When Hickman asked what was wrong, Tham stated, "I think he fucked his mom." Hickman testified that Tham was "freaking out." Hickman told Tham to try and calm down and to step out of the room. When Hickman asked what M.S's son was doing, Tham told her that he was sleeping in the bed with M.S. Hickman told Tham to stay quiet and take pictures so there would be proof.

When Hickman arrived at the facility, Tham opened the back door to let her in and together they went to M.S's room. Hickman testified that she saw M.S. on the bed. When appellant came out of the room, he was dressed only in white boxer shorts. Hickman testified that he was very aggressive toward her and asked, "Who the fuck are you?" Hickman responded, "Who the fuck are you, because I'm here – I'm the one here taking care of your mom." Appellant replied, "I'm her fucking son." Hickman told appellant, "Well, I've never seen you, and this is not acceptable.

4

Put your fucking clothes on." Appellant then left the facility. Hickman testified that M.S., who was unable to communicate, began to cry.

Arlington Emergency Medical Services ("EMS") Paramedic Jacob Menjarez was dispatched to the senior center to respond to a call that an elderly, non-verbal woman had possibly been sexually assaulted. Menjarez testified that the initial plan was to transport M.S. to a hospital for a sexual assault examination. However, during his assessment, Menjarez discovered that M.S. was not breathing. After determining that resuscitation efforts would be futile, M.S. was declared dead.

Dr. Stacy Murthy with the Tarrant County Medical Examiner's Office performed an autopsy on M.S. Dr. Murthy determined that M.S. died from hypertensive atherosclerotic cardiovascular disease and classified her death as natural. During the autopsy, Dr. Murthy collected vaginal, oral, and anal swabs from M.S.'s body as part of a sexual assault examination.

Forensic DNA Analyst Farah Plopper testified that she obtained a Y-STL profile from the vaginal swab taken from M.S. by Tham and compared it to the known Y-STL profile developed from the buccal swab taken from appellant. Plopper testified that appellant (or any patrilineal relative) could not be excluded as a contributor. She testified that the probability that another Caucasian individual would have the same DNA was estimated to be at 1 in 2,834. (R.R. VI:31, 33). Plopper also obtained a partial Y-STR profile from the vaginal swab obtained during

5

the autopsy and compared it to the profile from appellant's buccal swab. She testified that appellant (or any patrilineal relative) could not be excluded as a contributor, and that the probability that another Caucasian individual would have the same DNA was 1 in 501.

The jury found appellant guilty of one count of aggravated sexual assault[3] and one count of prohibited sexual contact. It found the habitual offender notice "true" and assessed appellant's punishment at eighty-seven years' confinement on each count. The trial court signed judgments of conviction on September 14, 2023. That same day, the trial court appointed Monroe Solomon III ("Solomon"), one of appellant's trial attorneys, to represent appellant on appeal.

On October 9, 2023, appellant filed a motion for new trial arguing that the verdict was contrary to the law and the evidence.

On May 8, 2024, Solomon moved to withdraw from the appeal on the grounds that he had discovered potential discovery violations that had occurred during his representation of appellant at trial that rendered him a potential fact witness at an evidentiary hearing. Solomon requested that this Court abate his appeal and

---

[3]    In the amended indictment, appellant was charged with two counts of aggravated sexual assault. Count One alleged that appellant "intentionally or knowingly cause[d] the mouth of [appellant] to contact the female sexual organ of M.S." Count Two alleged that appellant "intentionally or knowingly cause[d] the penis of [appellant] to contact [] the female sexual organ of M.S." The jury found appellant "not guilty" of Count One, and it found him "guilty" of Count Two.

authorize an out-of-time motion for new trial. This Court ordered the trial court to consider counsel's request to withdraw and appoint new appellate counsel, if necessary, and abated the appeal.

In accordance with this Court's order, the trial court held a hearing on Solomon's motion to withdraw. Solomon testified that he learned of an immunity agreement between the State and Tham. The agreement, which was admitted into evidence at the hearing, was filed with the Tarrant County District Clerk's Office on September 12, 2023. Solomon testified that the State never disclosed the immunity agreement to defense counsel, and that the first time he saw the agreement was on May 7, 2024, while he was reviewing the clerk's record for the appeal.

Harmony Schuerman ("Schuerman"), appellant's lead trial counsel, testified that she did not learn of the immunity agreement until Solomon sent it to her in May 2024. She testified that she filed a generic motion for new trial after the trial concluded, as is the practice in Tarrant County, and that she did not look at the clerk's record before she filed the new trial motion. She testified that the immunity agreement was in the district clerk's file when she filed the motion for new trial.

Following the hearing, the trial court granted Solomon's motion to withdraw as appellate counsel and appointed new counsel for appellant. This Court lifted the abatement and reinstated the appeal.

**_Brady_ and Article 39.14 Violations**

In his first issue, appellant contends that the State violated the requirement of *Brady v. Maryland* when it failed to disclose the immunity agreement with Tham to the defense. Alternatively, he asserts that the State violated its obligations under Article 39.14 of the Texas Code of Criminal Procedure by failing to disclose the immunity agreement. The State responds that appellant did not preserve his claim for appellate review. It further asserts that appellant failed to establish by a preponderance of the evidence that the State failed to disclose favorable, material evidence.

## A.    Applicable Law

*Brady* requires the prosecution to disclose evidence that is favorable to the accused when that evidence is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011) ("*Brady* held that the State has a constitutional duty to disclose to a defendant material, exculpatory evidence."). To establish a *Brady* violation, an appellant must demonstrate that (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; and (3) the evidence is material, that is, there is a reasonable probability that, had the evidence been disclosed, the outcome of the trial would have been different. *Ex parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012).

Article 39.14(h) of the Texas Code of Criminal Procedure provides that "[n]otwithstanding any other provision of this article, the state shall disclose to the defendant any exculpatory, impeachment, or mitigating document, item, or information in the possession, custody, or control of the state that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged." TEX. CODE CRIM. PROC. ANN. art. 39.14(h).

## B. Analysis

Appellant contends that he has established all three prongs of his *Brady* violation claim. First, he asserts that the State failed to disclose the immunity agreement between the State and Tham. According to appellant, a copy of the agreement was not delivered to defense counsel and no testimony was elicited to show that the immunity agreement had been delivered to appellant. Instead, the testimony of appellant's trial counsel demonstrates that the agreement was never delivered to the defense. Second, the withheld evidence was favorable to him because the immunity agreement related to the only purported eyewitness at trial and, had the agreement been disclosed, defense counsel could have impeached Tham. Third, the withheld evidence was material. According to appellant, the State used its direct examination of Tham to portray her as an assistant to law enforcement as well as a hero in its arguments to the jury. Additionally, Tham provided a link between appellant's alleged conduct and the scientific evidence that was presented

at trial. Appellant asserts that, alternatively, the failure to disclose this evidence violated Article 39.14 of the Texas Code of Criminal Procedure and affected his substantial rights.

Assuming, without deciding, that the State failed to disclose the immunity agreement, appellant has not preserved this claim for our review.

To preserve a complaint for appellate review, a defendant must show that he first presented to the trial court a timely request, objection, or motion stating the specific grounds for his desired ruling. TEX. R. APP. P. 33.1(a)(1)(A). The record also must show that the trial court either "ruled on the request, objection, or motion, either expressly or implicitly" or "refused to rule on the request, objection, or motion, and the complaining party objected to the refusal." TEX. R. APP. P. 33.1(a)(2)(A), (B). This preservation requirement applies to prosecutorial misconduct. *See Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd); *see also Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999) (noting *Brady* claim, like most errors, must be preserved at trial to be raised on appeal); *Keeter v. State*, 175 S.W.3d 756, 759–60 (Tex. Crim. App. 2005) (holding defendant did not preserve *Brady* claim for review because he failed to raise it in motion for new trial or at hearing).

Here, appellant filed a motion for new trial on October 9, 2023, alleging that the verdict was contrary to the law and evidence. His motion did not raise a *Brady*

10

or Article 39.14 claim regarding Tham's immunity agreement, despite the fact that the agreement was filed on September 12, 2023, and was part of the trial court's file.

Appellant's attempt to address his *Brady* and Article 39.14 claims at the hearing on Solomon's motion to withdraw does not alter our analysis. This Court granted an abatement so that the trial court could consider Solomon's request to withdraw as appellate counsel and to appoint new counsel, if necessary. This Court did not authorize the trial court to conduct an out-of-time motion for new trial on appellant's *Brady* and Article 39.14 claims, nor do the appellate rules authorize it. *See Fakeye v. State*, 227 S.W.3d 714, 717–18 (Tex. Crim. App. 2007) (concluding trial court's error in failing to admonish defendant as to deportation consequences of his plea was not remediable error under Texas Rule of Appellate Procedure 44.4 because it did not prevent proper presentation of case to appellate court); *see also Haynes v. State*, No. 02-14-00396-CR, No. 02-14-000397-CR, 2015 WL 4043258, at *1–2 (Tex. App.—Fort Worth July 2, 2015, no pet.) (mem. op., not designated for publication) (declining to grant abatement to allow defendant to file out-of-time new trial motion to develop record so that post-conviction habeas proceeding could be avoided); *Porter v. State*, No. 01-17-00534-CR, 2018 WL 4169482, at *9 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. ref'd) (mem. op., not designated for

11

publication) (holding issues defendant sought to develop for motion for new trial "can be properly raised in a post-conviction writ of habeas corpus").[4]

We further note that the trial court granted Solomon's motion to withdraw as appellate counsel and appointed new counsel for appellant without ruling on or otherwise addressing appellant's *Brady* and Article 39.14 claims. *See* TEX. R. APP. P. 33.1(a)(1) (stating to preserve complaint for appellate review, party must make timely request, objection or motion stating specific grounds for desired ruling and obtain ruling from trial court); *Brewer v. State*, 367 S.W.3d 251, 253 (Tex. Crim. App. 2012). Because appellant did not preserve his *Brady* or Article 39.14 claims for our review, we overrule his first issue.

### Speedy Trial Challenge

In his second issue, appellant asserts that his right to a speedy trial was violated. The State responds that appellant did not preserve this issue for review. It further asserts that he did not establish a speedy trial violation.

---

[4] Appellant may properly raise his claim regarding Tham's immunity agreement in a post-conviction habeas corpus proceeding. *See, e.g., Rodriguez v. State*, No. 01-22-00295-CR, 2023 WL 8262839, at *20 (Tex. App.—Houston [1st Dist.] Nov. 30, 2023, no pet.) (mem. op., not designated for publication) (noting claims not abated for an out-of-time motion for new trial may be raised in post-conviction hearing).

## A.    Preservation of Error

Preservation requirements apply to speedy trial claims.  *Henson v. State*, 407 S.W.3d 764, 768 (Tex. Crim. App. 2013).  The requirement of preservation allows for development of a record in the trial court sufficient for a speedy trial analysis under the balancing test set forth in *Barker v. Wingo*.[5]  *Id*.  An accused waives a speedy trial issue by not (1) raising the claim before trial begins, (2) presenting evidence of the claim to the trial court, or (3) obtaining a ruling after presentation of evidence of the claim.  *See Grimaldo v. State*, 130 S.W.3d 450, 454 (Tex. App.— Corpus Christi–Edinburg 2004, no pet.).

Here, appellant filed a pro se speedy trial motion on June 17, 2022, and his trial counsel filed a second speedy trial motion on May 17, 2023.  The record does not show that appellant presented either motion to the trial court, that the court held a hearing on them, or that the court ruled on them.  *See* TEX. R. APP. P. 33.1(a). Consequently, the trial court had no opportunity to develop the evidence pertinent to an analysis under *Barker*.  Filing a speedy trial motion alone, without taking the additional steps of presenting evidence of the claim to the trial court and obtaining an adverse ruling from the trial court, is insufficient to preserve an alleged speedy trial violation for appellate review.  *See Grimaldo*, 130 S.W.3d at 454 (holding speedy trial complaint not preserved when appellant fails to raise it before trial

---

[5]    407 U.S. 514 (1972).

begins, present evidence of claim to trial court, or obtain ruling); *see also Quigley v. State*, No. 02-15-00441-CR, 2017 WL 930066, at *12 (Tex. App.—Fort Worth March 9, 2017, no pet.) (mem. op., not designated for publication) (concluding defendant failed to preserve speedy trial claim for review where he filed speedy trial motion but record did not show that he presented motion to trial court, trial court held hearing on it, or trial court ruled on it).

However, even if appellant had preserved this issue, he still would not prevail.

**B.    Applicable Law**

The United States Constitution and Texas Constitution both guarantee an accused the right to a speedy trial.  U.S. CONST. amend. VI; TEX. CONST. art. 1, § 10; *see also State v. Lopez*, 631 S.W.3d 107, 113 (Tex. Crim. App. 2021) (describing Texas Constitution as containing "the same guarantee" as United States Constitution).  We evaluate a speedy trial claim under the four-factor test set out in *Barker v. Wingo*, which considers the length of the delay, the reasons for the delay, the extent to which the accused asserted the right to a speedy trial, and any prejudice suffered by the accused due to the delay.  *See Wingo*, 407 U.S. at 530; *Lopez*, 631 S.W.3d at 113.  The first of these four factors—the length of the delay—functions as a threshold mechanism: courts will not entertain a speedy trial motion unless the length of delay is sufficiently unreasonable.  *State v. Beck*, 695 S.W.3d 729, 738 (Tex. App.—Houston [1st Dist.] 2024, no pet.); *see also Gonzales v. State*, 435

14

S.W.3d 801, 808 (Tex. Crim. App. 2014) (explaining that court does not examine other factors unless accused first makes threshold showing that length of delay is unreasonable enough to warrant further inquiry). The conduct of the State and the defendant are weighed under each factor, though no single factor alone is necessary or sufficient to establish a speedy-trial violation. *Barker*, 407 U.S. at 533.

We apply a bifurcated standard of review: an abuse of discretion standard for the factual components and a *de novo* standard for the legal components. *See Lopez*, 631 S.W.3d at 113–14. While an evaluation of these factors includes fact determinations and legal conclusions, "the balancing test as a whole is a purely legal question that we review *de novo*." *Balderas v. State*, 517 S.W.3d 756, 768 (Tex. Crim. App. 2016) (citation omitted).

## C.    *Barker* **Factors**

### 1. **Length of Delay**

We assess the length of delay in two ways: first, we consider whether the delay is sufficiently lengthy to trigger consideration of the other *Barker* factors, and second we analyze the extent to which the delay weighs in favor of a speedy trial violation finding. *See Hopper v. State*, 520 S.W.3d 915, 924 (Tex. Crim. App. 2017). The

length of delay is measured from the time an accused is arrested or indicted until he demands a speedy trial or is tried. *Zamorano v. State*, 84 S.W.3d 643, 649 (Tex. Crim. App. 2002). But a given delay must be evaluated on its own facts, taking into account circumstances like the seriousness of the crime, complexity of the case, and whether the accused can make bail or will remain confined in jail while awaiting trial. *Beck*, 695 S.W.3d at 738. A defendant carries the burden to show that the delay is presumptively prejudicial. *Gonzales*, 435 S.W.3d at 808.

Appellant argues that the delay in this case was presumptively prejudicial. Appellant was arrested on October 25, 2021. He was indicted on April 27, 2022 and reindicted on July 21, 2023. His trial began on September 11, 2023, twenty-three months after his arrest. Because appellant was arrested, his right to a speedy trial began running from that date, as opposed to April 27, 2022, the date on which the formal charge was filed. *See United States v. Marion*, 404 U.S. 307, 321 (1971) ("Invocation of the speedy trial provision . . . need not await indictment, information, or other formal charge."); *see also State v. Page*, No. 05-18-01391-CR, 2020 WL 1899453, at *4 (Tex. App.—Dallas Apr. 17, 2020, no pet.) (mem. op., not designated for publication) (noting that defendant's right to speedy trial began to run from date of arrest rather than date on which information was formally filed).

"Generally, a delay of eight months to a year, or longer, is presumptively prejudicial and triggers a speedy trial analysis." *Lopez*, 631 S.W.3d at 114. In felony

sexual assault cases, the Court of Criminal Appeals has held that a four-month delay is not sufficient, *see Pete v. State*, 501 S.W.2d 683, 687 (Tex. Crim. App. 1973), while a seventeen-month delay is, *see Phillips v. State*, 650 S.W.2d 396, 399 (Tex. Crim. App. [Panel Op.] 1983). On appeal, the State concedes that the delay in this case is sufficiently long to trigger a full *Barker* analysis.

Once the *Barker* analysis is triggered, we then analyze the second part of the inquiry—"to what extent [the delay] stretches beyond this triggering length." *Hopper*, 520 S.W.3d at 924. We consider the complexity of the case in determining the weight given to this factor. *See Deeb v. State*, 815 S.W.2d 692, 705 (Tex. Crim. App. 1991). A delay that is constitutionally intolerable as to mundane lesser offenses, like ordinary street crimes, may be constitutionally tolerable for more serious or complex crimes that require greater preparation to present to a jury. *See Beck*, 695 S.W.3d at 742 (citation omitted). Appellant was indicted with two counts of aggravated sexual assault and one count of prohibited sexual conduct. This was a first-degree felony trial with DNA evidence. *See Deeb*, 815 S.W.2d at 705 (considering complex nature of "conspiracy to commit capital murder" case against appellant in determining that fifteen-month delay was not intolerable); *see also Colbert v. State*, No. 06-24-00055-CR, 2025 WL 794845, at *2 (Tex. App.— Texarkana Mar. 13, 2025, no pet.) (mem. op., not designated for publication) (considering complexity of case in which defendant was charged with one count of

17

aggravated sexual assault of child under fourteen years old and one count of indecency with child by sexual contact, first-degree felony trial was conducted, and DNA evidence was presented in evaluating length-of-delay factor).  However, we also consider that appellant spent twenty-three months in jail awaiting trial.[6]  While the complexity of the case and seriousness of the offense weigh in favor of the State, the length of time appellant spent in jail awaiting trial favors appellant.  We conclude, however, that the twenty-three months stretches beyond the minimum needed to trigger the inquiry.  *See Zamorano*, 84 S.W.3d at 656 (noting "eight months to a year has generally been considered the minimum to trigger a speedy trial analysis").  Under these circumstances, we conclude that the length of the delay weighs in favor of finding a speedy trial violation.

## 2. Reasons for Delay

With respect to the second factor, the State bears the burden of justifying the delay.  *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008).  The weight courts assign to delay differs depending on its cause.  *Hopper*, 520 S.W.3d at 924.  Deliberate delay by the State to hamper the defense weighs heavily against the government.  *Id.*  More neutral reasons, like negligence or overcrowded dockets, still weigh against the government but less heavily so.  *Id.*  Justifiable delay does not

---

[6]    The judgments of conviction assessed a credit of 692 days toward appellant's sentences.

18

count against the government. *See Gonzales*, 435 S.W.3d at 810 (observing that delay counts toward length of delay requiring explanation only when delay is unjustifiable in nature while delay is discounted when it is justifiable). Delay attributable to the defense weighs against finding a speedy trial violation. *See Hopper*, 520 S.W.3d at 924; *see also Balderas*, 517 S.W.3d at 768 (stating that delay caused by defendant or defense counsel weighs against finding of speedy-trial violation). In the absence of a reason given for the delay, a court may presume neither that the delay is justified nor unjustified. *Balderas*, 517 S.W.3d at 768.

The record does not show that the State filed any trial continuances or otherwise acted to deliberately delay the trial.[7] In his speedy trial motion filed by counsel, appellant asserted that neither he nor defense counsel had committed any act or omission contributing to the delay, and that he had announced ready at each of the five court settings. However, the record also shows that appellant was originally appointed a different defense attorney on October 26, 2021, and that he filed a declaration of conflict between attorney and client and motion for substitution of appointed counsel on July 12, 2022. Ms. Schuerman was not appointed to represent him until August 5, 2022. Thus, more than nine months of the twenty-three month delay, or approximately forty percent, is attributable to appellant's

---

[7] The only continuance occurred when the trial court granted the parties' joint motion for a continuance of the pretrial hearing on appellant's application for writ of habeas corpus and motion and reset the hearing for two weeks later.

conflict with his original counsel and request for substitute counsel. *See Porter v. State*, 540 S.W.3d 178, 182 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (concluding that delay was caused by, among other things, defendant's conflicts with his trial counsel, which resulted in three different appointments of counsel); *see also White v. State*, 03-22-00771-CR, 2024 WL 4520692, at \*4 (Tex. App.—Austin Oct. 18, 2024, pet. ref'd) (mem. op., not designated for publication) (noting delay was partially caused by defendant's conflicts with her trial counsel, appointment of substitute counsel, and by new counsel needing to prepare for trial, which weighed against finding speedy trial violation).

Assuming that the remaining delay was attributable to overcrowded dockets, this reason weighs against the State but less heavily than deliberate delay. *See Hopper*, 520 S.W.3d at 924 (noting that neutral reasons for delay, like crowded dockets, weigh against State but do so less heavily than deliberate delay by State). Because the delay in this case is attributable to both parties, this factor weighs neither for nor against finding a speedy trial violation.

### 3. Assertion of the Right

Appellant bore the burden to timely "assert his right to a speedy trial." *Cantu*, 253 S.W.3d at 280 (citing *Barker*, 407 U.S. at 531). "A defendant's 'assertion of his speedy trial right is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.'" *Lopez*, 631 S.W.3d at 116 (quoting

*Zamorano*, 84 S.W.3d at 651). A speedy trial demand should be unambiguous. *Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013); *Ussery v. State*, 596 S.W.3d 277, 286 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd).

Appellant filed his pro se motion for speedy trial on June 17, 2022. While appellant's motion constituted some effort to invoke his right to a speedy trial, the invocation was not unambiguous because the record does not show that it was presented to the trial court or that the trial court was even aware of its existence. *See Ussery*, 596 S.W.3d at 288. Schuerman filed a second speedy trial motion on May 17, 2023. Similarly, the record does not show that the second motion was presented to the trial court or that the trial court was aware of it. *See id.* And, it was filed nine-and-a-half months after Schuerman's appointment and less than four months before trial. Given the delay, coupled with the fact that trial occurred less than four months after assertion of the right, this factor does not weigh in favor of finding a speedy trial violation. S*ee Kelly v. State*, 163 S.W.3d 722, 729 (Tex. Crim. App. 2005) (finding delay of more than one year in asserting right to speedy trial, and fact that trial occurred only two months later, weighed against defendant); *see also Wickware v. State*, No. 12-22-00180-CR, 2023 WL 5666218, at *6 (Tex. App.—Tyler Aug. 31, 2023, no pet.) (mem. op., not designated for publication) (concluding that defendant's delay in asserting right to speedy trial, and fact that trial occurred

slightly less than four months following assertion of right, weighed against defendant).

### 4. Prejudice

"Because 'pretrial delay is often both inevitable and wholly justifiable,' the fourth *Barker* factor examines whether and to what extent the delay has prejudiced the defendant." *Cantu*, 253 S.W.3d at 285 (quoting *Barker*, 407 U.S. at 532). We analyze this factor "in light of the defendant's interests that the speedy-trial right was designed to protect: (1) to prevent oppressive pretrial incarceration, (2) to minimize the accused's anxiety and concern, and (3) to limit the possibility that the accused's defense will be impaired." *Id.* The last form of prejudice "is the most serious 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" *Id.* The defendant has the burden of showing prejudice but need not show actual prejudice. *Balderas*, 517 S.W.3d at 772. Conclusory assertions are not sufficient to carry a defendant's burden to show that he was prejudiced by delay. *State v. Moreno*, 651 S.W.3d 399, 415 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

We note that the trial court did not hold an evidentiary hearing on appellant's speedy trial motions. This fact is especially significant with respect to the issue of prejudice because prejudice is a fact-intensive inquiry. *See Henson*, 407 S.W.3d at

769 (characterizing prejudice as fact intensive and stating it may not be readily apparent without factual development in trial court).

In his pro se motion, appellant asserted that he was prejudiced by the delay because "defense witnesses are becoming unavailable" and the remaining witnesses "will have forgotten facts that would be beneficial" to him. His motion did not identify the witnesses who had become unavailable or specify which facts the remaining witnesses would have forgotten. *See Beck*, 695 S.W.3d at 748 (noting conclusory assertions do not demonstrate prejudice). In his second speedy trial motion, appellant asserted that he had suffered oppressive pre-trial incarceration as well as anxiety and concern regarding the outcome of the trial; however, he did not provide any underlying factual details about the effect his incarceration had on him or about his anxiety or concern. *See id.* Moreover, a defendant's anxiety must be greater anxiety or concern than the level normally associated with a criminal charge or investigation to be sufficient proof of prejudice. *See Cantu*, 253 S.W.3d at 286 (requiring evidence of "greater anxiety or concern beyond the level normally associated with a criminal charge or investigation" to suffice as proof of prejudice factor under *Barker*). We conclude that appellant's conclusory assertions are insufficient to show that he was prejudiced by the delay. This factor weighs against finding a speedy trial violation.

### 5. Balancing of *Barker* Factors

23

"[C]ourts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed." *Id.* at 281. Although the twenty-three month delay weighs in appellant's favor, the second factor is neutral and the third and fourth factors weigh against finding a violation of appellant's speedy trial right. We conclude that the weight of the factors, when balanced together, weighs against appellant and his right to a speedy trial was not violated. We overrule appellant's second issue.

## Conclusion

We affirm the trial court's judgment.

Kristin M. Guiney
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Guiney.

Do not publish. TEX. R. APP. P. 47.2(b).